## Case No. 6,183.

### HARVEY v. RICHARDS.

[2 Gall. 555.] [1]

Circuit Court, D. Massachusetts. Oct. Term, 1815.

### ISSUE OUT OF CHANCERY—LEGITIMACY.

[1] [Reported by John Gallison, Esq.]

## Case No. 6,184.

### HARVEY v. RICHARDS.

[1 Mason, 381.] [1]

Circuit Court, D. Massachusetts. May Term, 1818.

COURTS OF EQUITY — ADMINISTRATORS — ACCOUNT AND DISTRIBUTION OF THE ESTATE OF A DECEASED PERSON DOMICILED ABROAD.

1. A court of equity has jurisdiction to decree an account and distribution, according to the lex domicilii, of the estate of a deceased person domiciled abroad, wihch has been collected under an administration granted here.

[Approved in Union Bank of Georgetown v. Smith, Case No. 14,362. Cited in The Boston, Id. 1,669; Perry Manuf'g Co. v. Brown, Id. 11,015; Walker v. Beal, Id. 17,065; Swatzel v. Arnold, Id. 13,682; Walker v. Beal, 9 Wall. (76 U. S.) 755.]

[Cited in Childress v. Bennett, 10 Ala. 751; Tyler v. Thompson, 44 Tex. 497; Cooper v. Beers, 143 Ill. 27, 33 N. E. 61; Saunders v. Williams, 5 N. H. 214; Heydock's Appeal, 7 N. H. 503; Goodall v. Marshall, 11 N. H. 93; Dent's Appeal, 22 Pa. St. 517; Despard v. Churchhill, 53 N. Y. 199; Churchill v. Boyden, 17 Vt. 321; High's Appeal, 2 Doug. (Mich.) 522.]

[See Van Reimsdyke v. Kane, Case No. 16,-871.]

2. But whether it will proceed to decree such account and distribution, or direct such assets to be remitted, to be distributed by a foreign tribunal, depends upon the circumstances of the case.

[Cited in Mothland v. Wireman, 3 Pen. & W. 188; Gravillon v. Richard, 13 La. 293; Goodall v. Marshall, 11 N. H. 93; Lawrence v. Kitteridge, 21 Conn. 582–585; Olney v. Angell, 5 R. I. 200; Noonan v. Kemp, 34 Md. 75; Re Apple, 66 Cal. 432, 6 Pac. 9; Graveley v. Graveley, 25 S. C. 1; Welch v. Adams, 152 Mass. 77, 25 N. E. 34; Cross v. United States Trust Co., 131 N. Y. 347, 30 N. E. 129; Irving v. McLean, 4 Blackf. 53; Swearingen v. Morris, 14 Ohio St. 431; Parker's Appeal, 61 Pa. St. 482; Williams v. Welton, 28 Ohio St. 466; Re Hughes, 95 N. Y. 60, 61.]

[1] [Reported by William P. Mason, Esq.]

[3] MS. Records. Court of Assistants, Suffolk County, March, 1691. Andrew Belcher v. James Lloyd. Appeal from the county court in an action on a charter-party. The appellant desired a special jury of merchants, which was accordingly granted. There are many like cases.

This was a bill in equity [by Mary Harvey] to compel the defendant [John Richards] who was administrator with the will annexed of James Murray, late of Calcutta, in the province of Bengal, deceased, to a distribution of the undevised estate of the testator in this country, among the next of kin residing here. The executors appointed by the will of the testator, resided in Calcutta, and the defendant was appointed by them an administrator for the purpose of collecting the testator's effects here. The same parties had been heard in court, at two former terms on other points. [See Cases Nos. 6,182, 6,183.] The question that now came up was, whether the defendant should be ordered to distribute the effects in his hands among the next of kin in this country, or should send it to Calcutta to be distributed by the executors there.

Mr. Aylwin, for plaintiff.

The first question is, whether this court has authority to distribute the undevised surplus among the next of kin, according to the law of the testator's domicile? It is averred in the answer, "that this court has no authority to distribute the undevised surplus, but it ought to be transmitted to Bengal." This principle we wholly deny. The law of the testator's domicile must be the rule; and it will be our duty to show, that this court can apply that rule. To decide this question, it may be useful to consider, whether this is substantially an original administration, or merely auxiliary to the principal one of the executors in India. If it be the former, there can be little doubt in relation to the authority of the court.

As to the facts, it is assumed, that there are no debts abroad, nor any specific trusts under the will to be executed. The testator by his will evidently intended to die intestate, as it regards this property. He says, "the property now going to America, I do not consider as belonging to any person." And he then constitutes a mercantile partnership to be his executors. The next of kin are citizens of the United States. Now, from the decisions in England it is evident, that the appointment of an executor in India, is considered as merely constituting him an agent. In Chetham v. Lord Audley, 4 Ves. 72, the lord chancellor says, "I think the appointment of an executor in India, no legacy being given to him, is the appointment of an agent for the management of the estate. They give him the character of executor." The same doctrine is affirmed in De Mazar v. Pybus, Id. 648, as it regards the appointment of a partnership to be executors. The place, where the will was made and proved, does not necessarily draw to the courts of that place the exclusive administration of the estate. In both these cases, although the wills were proved in India, the court of chancery in England undertook to direct the settlement of the estates; and upon the principle of these cases we may safely rely,

that this is, in reality, an original administration. But whether so or not, still on the grounds of public law and universal justice the complaint is well founded in asking relief from this court. A court of chancery being one of general jurisdiction, appears to be peculiarly fitted for the administration of foreign laws, when they affect property within its jurisdiction. It is a remark of Lord Kaimes (2 Pr. Eq. pp. 312–315, 318, 326; Id. b. 3, pp. 336–340, c. 8) that "it is of great importance to every nation, that justice have a free course everywhere; and to this end it is necessary, that in every country there be an extraordinary jurisdiction for foreign matters, as far as justice is concerned." And under this title of "foreign matters," he discusses the question as to the distribution of moveables, and lays down the position, that every question in relation to them must be determined by the judge of the place; but it must be according to the law, which governed the owner of them. Lord Hardwicke, 1 Atk. 19, asserts, that though foreigners are subject to the authority of the court of chancery only while in England, yet their property in England is under its control. 2 Coop. Eq. Pl. pp. 123, 124. And Lord Ellenborough states, in Potter v. Brown, 5 East, 124, "that it is every day's experience to recognize the laws of foreign countries as binding on personal property, as in the succession to personal property by will or intestacy of the subjects of foreign countries." In conformity with this rule, a variety of decisions have taken place in Scotland and England. Bruce v. Bruce, in notes to Marsh v. Hutchinson, 2 Bos. & P. 229, is a case of distribution by the courts of Scotland, according to the law of England. Balfour v. Scott, 6 Brown, Parl. Cas. 550 (St. Distrib. 1793), was a decree of a Scotch court for distribution according to the law of England of personal estate in England; and it was affirmed in Dom. Proc. as to distribution. Hog v. Lashley, 6 Brown, Parl. Cas. 577 (St. Distrib. 1792), was the case of a Scotchman making his will in England, which was there proved. Distribution was according to the law of Scotland. Kilpatrick v. Kilpatrick, cited 6 Brown, Parl. Cas. 584 (1781), distribution by Lord Kenyon (master of the rolls) according to the law of Scotland of a legacy given by an Englishman to a Scotchman, which had not been received in the life-time of the latter. Drummond v. Drummond, 6 Brown, Parl. Cas. 601 (1799), is also a case, where the Scotch court decided on the distribution of Scotch property by the law of England, where the administration was originally granted in England. In Bempde v. Johnstone (1796) 3 Ves. 198 (The Marquis of Annandale's Case), one of the bills filed was by Lady Graham for a distribution according to the Scotch law. The lord chancellor heard the arguments on the question of domicile, but finding it fixed in England, her bill was dismissed; and a de-

cree according to the prayer of the other. Somerville v. Lord Somerville, 5 Ves. 791, is a case of distribution by the court of chancery, according to the Scotch law, "the distribution arising from the place, where the property is situated." From what may be gathered in the case of Bowaman v. Reeve, Finch, Prec. 577, it appears that the testator, executor, and legatee were natives of Holland, and there settled; nevertheless a bill brought by the legatee against the executor (who had proved the will in England) for a recompense out of the personal estate in lieu of a specific legacy taken by a creditor in Holland, was sustained by the lord chancellor. Tourton v. Flower, 3 P. Wms. 369, 2 Eq. Cas. Abr. 78, pl. 9, was a case where Tourton, a banker at Paris, made his will, and gave a legacy to one Theluson, which had been set aside in France in favor of the next of kin. The French executor being dead, administration with the will annexed was granted by the Archbishop of Canterbury, and a bill was brought by the mothers, who had taken administration in France on the estate of the next of kin, against the administrator with the will annexed for a discovery and account. The defendants demurred, because there was no representative of the deceased Tourton in England, and the executor of the will might have left an executor. The lord chancellor said: "The administration being taken out here, I will look upon the same to be good." But on demurrer ore tenus, because the mothers had not taken out administration to their sons in England, the bill was dismissed for want of proper parties.

These are the cases in England. In our own country similar decisions have taken place. The case of Desesbats v. Berquier, 1 Bin. 336, was that of a will executed according to the forms of the law, where the property was, but not in conformity with the law of the testator's domicile; and it was held by the supreme court of Pennsylvania to be invalid. And from that case it is to be inferred, that the administrator was directed to distribute the property according to the laws of the testator's domicile. However that may be, in the case cited in the note (Guier v. O'Daniel, Id. 349) it was expressly decreed in Pennsylvania, that distribution should be made according to the law of Delaware. In the case of Selectmen of Boston v. Boylston, 2 Mass. 386, upon an interrogatory, as to what amount of property was received by the administrator in England, it was held, that he was not bound to answer. The counsel for the administrator in the course of their argument, to show the impropriety of accounting here, ask, how can our judges, if they undertake to distribute here, know the laws of foreign countries? Sedgwick, J., replies, the same difficulty must arise in every administration of a foreigner's estate originally taken here. The judge must distribute according to the laws of the intes-

tate's country. Thus it appears, that courts of justice will take cognizance of foreign laws affecting property within its jurisdiction, and deliver it to the party, to whom of right it appertains in cases of original administration. Still it is supposed by some mystical virtue, belonging to the species of administration, under which the defendant in this case acts, that the application of a different rule is required. That because this is an ancillary administration, the rights of the parties cannot be here established, and the court must turn a deaf ear to their application. Although this administration in form is auxiliary to the principal one, yet in substance it is not. The property here is not required for the execution of any trust confided to the executor under the will; for the testator, in relation to this property, never reposed in him. Let it, however, be considered as an ancillary administration.

It is denied, that there is any general rule of public or municipal law, which requires that parties entitled to a foreigner's property shall seek their rights only in the courts of his domicile. From Pipon v. Pipon, Amb. 25, and a class of cases somewhat resembling it, it will no doubt be attempted to derive such a rule. The party, who applied for the distribution of the bond debt found in London, was not entitled by the law of the intestate's domicile, to a distributive share. That alone was sufficient to cause a dismissal of the bill. Lord Hardwicke declines going into the general question; but states his opinion, as it regards the rule of distribution, that the property follows the person, and becomes distributable according to the law or custom of the place, where the intestate lived. This principle cannot be questioned. And his other remarks can only apply to a case, where the party having a right to the debt, ought not to call for a partial account, because the statute requires a distribution of the whole residue, &c. He however says, that that case differs from where a specific part consists of chattels here in England. The whole argument turned on the point, whether the taking out of an administration in England altered the course of descent. See Sill v. Worswick, 1 H. Bl. 690, Lord Loughborough's opinion.

The next case in order of time is Thorne v. Watkins, 2 Ves. Sr. 35. Here the defendant was one of the executors of Richard Watkins, who resided in Scotland, died there, and left his estates among his nephews and nieces, of whom the defendant was one; and he was also administrator, and one of the next of kin of William Watkins, who was entitled to a share in Richard's personal property, and who resided in England, and died there intestate. It was held, that William's share in his estate should be distributed according to the law of England. Lord Hardwicke puts a case, "If a man dies here, and administration is taken out here, where he has left personal estate, and he has

debts abroad in France, Holland, or the plantations, which cannot be recovered abroad by virtue of the prerogative administration taken out here, the administrator must invest himself with some right from the proper courts in that country, as administration must be from the governor of the plantation, if it arise there, which must be for form; and it is generally granted on the foundation of the administration granted here, and then it must be distributed as here." The reason of the decision in Pipon v. Pipon, was, that, it called for a distribution of a part. Neither of these cases, and they turn upon their particular circumstances, establish the pretended rule. Still less support will it derive from the case of Burn v. Cole, Amb. 415. The marginal note, in fact, states the reverse of this proposition. "One dies intestate having personal property in England and abroad; distribution must be according to the law of that country, where he was resident when he died."

The case of Jauncy v. Sealey, 1 Vern. 397, can have but little bearing in favor of the defendant. The plaintiff as administrator of T. S. deceased brought a bill for discovery. The defendant pleaded a nuncupative will made by the deceased according to the law of Naples, where he resided; by which he was appointed executor, and denied that he left any estate but what was at Naples. The court allowed the plea. No English authorities, it is believed, can be adduced, which maintain this general proposition. But it will be said, that in this state decisions have taken place, which go to this length. The cases of Richards v. Dutch, 8 Mass. 514, and of Dawes v. Boylston, 9 Mass. 355, will be pressed unquestionably on the court, as decisive of this point. The first case arose upon a motion for a new trial. There it was contended, that parol evidence ought not to have been admitted to give a construction to a clause in the will, under which the defendant claimed to hold the property; and if it had been properly admitted, still a legatee had no right to take a legacy without the assent of the executor. Upon the first ground, no lawyer could entertain a doubt; and on the second, as little: for no proposition is more clear, than that the bequest of a legacy transfers only an inchoate property to the legatee. Toll. Ex'rs, p. 306. The decision of the court is stated in a very few words, and what is added by the reporter is extra-judicial. "That legatees, who claim only from the bounty of the testator, must resort to the country of the testator, where the will was originally proved, and by the laws of which his effects are to be distributed, to obtain the bounty they claim." It does not appear however from the report, that this point was discussed. The case of Dawes v. Boylston, certainly affirms the position; and although, under the particular circumstances of the case, it may have been correct, yet it is limited to

a claim of residuary legatees, for those were the only persons calling for the aid of the court; and what was the residuum could be better ascertained by the prerogative court of Canterbury, than by our courts. It is the decision of one judge only, and indeed a very respectable one; but it is apprehended, that its force is much weakened by a careful examination of the statute, and a subsequent decision of the whole court of Massachusetts. The statute provides for filing and recording wills proved out of the government; and enacts (1 St. 1785, p. 246, c. 12) "that the judge may thereupon proceed to take bonds of the executor, or grant administration of the said testator's estate lying in this government (with the will annexed) and settle the said estate in the same way and manner, as by law he may or can, upon the estates of testators, whose wills may have been duly proved before him." How this power, delegated to the judge of probate, was deemed inadequate for the purposes specified, it is difficult to imagine. To say, that these terms do not mean, what they evidently import, is rather to exercise the power of legislation, than of exposition. It is admitted by the judge, that the probate bond given here might be enforced to procure an inventory and an account from the administrators. Still to what beneficial purpose could this tend? The administrator is resident here. The process of the courts of England could not reach him; and no bond is there required of an executor or administrator with the will annexed; all that is exacted from him, is an oath to render an account. Even the bond of an administrator in England does not require him to do more; it does not afford security for the payment of the distributive shares of the next of kin. If the principle of the decision of the courts of Massachusetts be correct, the administrator might remain here with the property he has collected under the authority of our courts, and set at defiance the claims and rights of our citizens, unless these citizens were creditors. Such consequences, without doubt, led that court to qualify its decision. and to adjudge in the case of Stevens v. Gaylord, 11 Mass. 264, that "if it appeared that the deceased had his home in Connecticut, they should cause the balance remaining in the hands of the administrator here to be distributed according to the laws of Connecticut, or transmitted there for distribution by their courts." The decision, therefore, leaves the question in this state still open; and in every case, which may arise, the discretion of the court in relation to its particular circumstances, will, as it undoubtedly ought, be freely exercised.

What principle of national justice can require our courts to send its citizens into foreign countries, there to establish those rights, which may be here ascertained? The same end can alone be effected abroad. which will be attained here. It is in effect to cause an

useless expense and unnecessary delay, without any reasonable motive. 4 Mass. 324. Courts of chancery do not adopt such narrow rules for their government. In the language of the lord keeper, 2 Ch. Cas. 200, "when it can determine the matter, it will not be an handmaid to other courts, nor beget a suit to be ended elsewhere." And accordingly in the case of Alexander v. Alexander, 2 Ch. R. 37, where a bill was brought against an executor to discover assets and for satisfaction; and it was said for the defendant, that the plaintiff "ought not to have relief in chancery, for he had a proper remedy at law." 1 Vern. 429. But the court being possessed of the cause, and the same being as proper for this court as at law, it was decreed to avoid a circuity of action, that the defendant should account and make the plaintiff satisfaction. If, then, in England, a party will not be turned out of a court of equity, because he can have redress in a court of law, is there not greater reason for not sending our own citizens to a foreign tribunal to vindicate their rights? Further, the administrator in this case being the agent of the executor, he ought to be considered like his principal, the trustee of the next of kin. And upon chancery principles he need not be a party; for he who takes a trust estate, takes it subject to the trust, and is directly responsible to the cestui que trust. A trustee to another's use made a letter of attorney to T. S. (Pollard v. Downes, 2 Ch. Cas. 121; 1 Eq. Cas. Abr. 6), to manage and receive the rents and profits of the trust estate, who did so, and accounted to the trustee; and now being sued by cestui que trust, insisted that the trustee, and not he, was to account; and that he, having already accounted, might be quiet as to the plaintiff, but he was decreed to account to the plaintiff. Where there was a demurrer to a bill for a legacy, Nicholson v. Sherman, 1 Ch. Cas. 57, because one of the defendants was not the executor, the court declared, that as he had got the estate, the demurrer should be overruled. The estate ought to be liable to legacies in whosesoever hands it may be found. Where there are two executors, and one is beyond the sea and the other in England, and a bill is brought against him that is in England, he having assets in his hands to answer the demand, it is held, that the other executor need not be made a party in such a case. 2 Eq. Cas. Abr. 464. The rule appears to be, that whosoever is in possession of the trust property, may be alone sued. But where the creditor, legatee, or next of kin, seeks an account against the debtor of the deceased, it cannot be done without joining the legal representative, and charging collusion. The principle is fully stated by Lord Hardwicke, in Newland v. Champion, 1 Ves. Sr. 105. The same is held in Doran v. Simpson, 4 Ves. 665.

Thus it appears evident, that a court of chancery will dispose of property, without requiring all parties to be brought before them, who may be affected. When it is necessary, however, as in the case of Wilde v. Holtzmeyer, 5 Ves. 813, it will always afford time to parties abroad to come in and state their rights. This bill has been pending several years; the original executor has had an opportunity of becoming a party, if he chose. As he is out of the reach of the court, we could not compel him to join. What will be the consequence, should the court decree upon the principle contended for by the defendant? It appears, that M'Clintoch is not in India. If the property be remitted there, we have no redress; for the English law does not compel the executor to give security, and, according to the defendant's rule, we have no other forum than that of Bengal to resort to. If we run a race after him in England and Ireland, through the medium of the high court of chancery; and if that court should not adopt the rule contended for by the defendant; and if M'Clintoch should not then be bankrupt, that court will award to us nothing more than what we ask at the hands of this tribunal. Whether then this administration be considered as an original one, or merely ancillary to that of the executor; or whether this cause be regarded in relation to its own peculiar circumstances, we feel confident, that the plaintiff is entitled to a decree of the court, as prayed for in the bill.

Prescott & Hubbard, for respondent.

There are two questions which arise out of this case. 1st. Is the residue of this estate to be distributed according to the law of the country, where the deceased was domiciled? 2dly. Is the administrator, appointed to collect the effects in this country, to remit the balance in his hands to the general administrator in India, or is he bound to make distribution of it here, if called upon so to do by persons rightfully entitled to it?

The first of these questions is already well settled by authorities. 2 Hub. Praelect. lib. 1, tit. 3, § 18; Voet, Com. b. 38, tit. 17, § 34; Bruce v. Bruce, 2 Bos. & P. 229. And the counsel for the plaintiff appear willing to concede that the law of the country, where the deceased was domiciled, is to regulate the distribution of his estate. We come then at once to the second question; and if upon this subject no precedents are to be found, the court will adopt such a rule as will prove most generally convenient.

The interests of all who are in any way concerned in the estate of deceased persons, either as creditors, debtors, legatees or heirs, require, that such estate should be brought to a final settlement with as little delay, and as much after the manner, in which they would have been conducted by the deceased themselves, had they continued to live, as possible. This can only be effected by appointing some one to represent the deceased, to whom authority shall be given to arrange and settle the estate; to carry into effect the

engagements the deceased was under at the time of his death; to compel others to the performance of their engagements towards him; and to distribute the remaining property among those, who have a legal title to it. We find accordingly, that in all civilized countries such persons are appointed. The representative enters into an obligation to the government under whose authority he acts, to execute the trust committed to him with fidelity and diligence; and the better to ensure this, he is called upon, at stated periods, to render an account of his doings to the proper authority, and explain the situation of the estate. How can these duties be performed with more justice to the debtors, creditors, and legatees; more beneficially to the estate; or more conveniently to all parties interested; than by having the funds collected together in one place, and put into the hands and at the disposal of one person. There will then be one general account rendered of all the estate by the same person, and the balance be distributed according to the laws, which are to regulate the distribution, in that place, where those laws are best known and most easily applied. We contend, therefore, that the administration in this country is merely ancillary to that in India. The administrator there must either come to this country himself to collect the effects here, or some person must be employed to do this for him. This state, influenced by the comity, which exists between different countries on this subject, invests the person pointed out by the original administrator with authority to collect these effects; and, in return for this indulgence, requires that the debts due to its own citizens shall be paid before these funds are withdrawn, either ratably or fully, according to the laws of that country. And it may be considered, perhaps, but reasonable, that as the administrator out of comity and favor is authorized to demand and collect the debts due from our own citizens to the estate, he should likewise be held to discharge out of the same fund such debts as are due from that estate to our citizens, although this may occasion some inconvenience and delay. But this reasoning can by no means apply to such persons, as claim from the bounty of the deceased merely; and the adoption of such a rule with regard to them, might, in some cases, become an insurmountable obstacle to the settlement of the estate. Supposing the estate of the deceased to be scattered in small portions throughout the whole of the United States, and the administrator in each state considered as an original and general administrator, liable to the demands of all the creditors, legatees, and heirs. What endless confusion would here be created! What a variety of accounts! What opportunities for fraud and embezzlement! In such case the administrator abroad, instead of calling in to himself the accounts of these numerous administrators, and collecting together the property thus dispersed, would be first obliged to render an account to each of them; and it would be necessary, too, that such an account should include in it the separate accounts of every other individual administrator; add to this, each of these administrators is to make himself acquainted with the laws of the country, in which the deceased was domiciled, in relation to this subject, and to distribute the property in his hands as that law prescribes. It seems hardly possible to conceive, how the difficulties, which would inevitably arise in such a state of things, could be surmounted at all; and if they could, it would certainly be at the expense of much time, and a great expenditure of the property. It seems to us but little consonant with justice, that such injury to the estate, and such difficulty to those who administer it, should be created by persons claiming merely from the bounty of the deceased. But we do not press the adoption of the rule, which we think the most proper and beneficial one in this case, merely on the ground of its greater convenience. We contend that it is already expressly laid down by some authorities; that it is fairly to be inferred from others; and will not be found to be contradicted by any. Whereas the rule contended for by the plaintiff is in no instance clearly recognized.

In the cases cited by the plaintiff's counsel, where a surplus has been distributed, it will be found, that the general administrator was before the court, and had submitted to the jurisdiction. The cases may be classed under two heads: 1st. Of applications to chancery. 2dly. Of appeals to the house of lords. Among the cases cited by the plaintiff, under the first class, are Bowaman v. Reeve, Finch, Prec. 577. Here a Dutch subject made his will; gave a part of his estate in charities, and the residue to his executor. The executor refused to prove the will in Holland, but proved it in England. The property given was taken for debts, and the legatees applied for relief. In this case the executor (who was a party in interest) and the property, were both in England under the jurisdiction of the court. Tourton v. Flower, 3 P. Wms. 369. This was a bill in chancery, brought by the administrators of the next of kin to the testator, against the administrator of the testator's executor. The defendants demurred, because there was no representative of the testator before the court; for it did not appear that the executor of the testator had not made a will and left an executor, in which case the administration granted to one of the defendants would have been void; and the case was decided in favor of the defendants. But there is nothing to show, that if it had been decided in favor of the plaintiffs, distribution would have been ordered in England. Kilpatrick v. Kilpatrick, 6 Brown, Parl. Cas. 584, is a case in which the executor was before the court.

In these cases, which come under the class of appeals, the whole case was brought before the court by the appeal. The cases found in Ambler, we think, support our position. In Burn v. Cole, Amb. 415, administration had been granted in England, and Lord Mansfield held, that the judge in Jamaica was bound by the administration in England to grant the administration in Jamaica to the same person. So in the case cited in the note, administration had been granted to the widow in England and to the sister in Jamaica; the court of appeals reversed the administration to the sister, and held, that the widow appointed in England was entitled to the administration in Jamaica. The effect of this was to transfer the whole estate to one person. The administration in the plantation was ancillary only. Why is the administration granted to the same person in the colony as in the mother country, unless it be for the purpose of having one account only? The same reason would apply to an administration in an independent nation. Comity will effect with an independent nation, what the power of the appellate court compelled the colony to do. In Pipon v. Pipon, Amb. 25, the domicile of the deceased was in Jersey, and administration on his estate granted there. Administration was also taken out in England, for the purpose of collecting a bond debt of 500l.; the application was for a distribution of this sum according to the English law. The chancellor refused to order a distribution, because it ought to be distributed according to the laws of the deceased's domicile, in which case the plaintiffs would not be entitled; and also because this was but a part of the deceased's estate, which remained to be distributed, and the general administrator not being before the court, the court could not direct an account of the whole. The same reason will apply for not granting the application of the plaintiff in this case. The general administrator is not before the court, therefore the court cannot compel an account of the whole estate; and they will not grant an application for an account and distribution of a part only. In Somerville v. Lord Somerville, 5 Ves. 791, the chancellor seems very clearly to suppose, that the property was to be transferred to the place of the domicile.

Three cases have arisen in our own state court, in two of which the rule we contend for was expressly laid down, and in the other it was unnecessary to consider it. In Richards v. Dutch, 8 Mass. 506, it is expressly stated, that those who claim from the bounty of the testator must resort to the country of the testator, where the will was originally proved, and by the laws of which his effects are to be distributed. This case arose from the claim of a legatee under the will, and was very fully argued and considered. In the case of Dawes v. Boylston, 9 Mass. 337, in which this was the principal

question, the court say, that the personal effects are to be accounted for, and finally administered in the place, where the deceased was domiciled, wheresoever they may have been collected. That the administration in this country was justly entitled ancillary, in respect to the administration in the jurisdiction of the prerogative court. That the defendant had an authority to collect and pay debts, and was liable for the contracts and duties of the testator, which were recoverable and might be enforced within this jurisdiction; but that he was not liable in the court of probate to a decree, either of payment or of distribution, whether to a legatee or heir, upon any partial account to be there rendered and adjusted.

It is made a question by the plaintiff's counsel, whether the administration in India can be called the original or principal administration, in contradistinction to the administration in this country; and they assert, that in England the India administrators or executors are considered as agents merely. This is so, because India is a province of Great Britain; and the Englishmen residing there usually remit their estates to England. Two sets of executors are appointed, one for England and one for India. The executor in England may then well be called the principal, because the effects are there. The probate, which establishes the will, is the foundation of all the administrations afterwards granted.

Mr. Webster, in reply.

This argument proceeds on the ground, that no debts or legacies remain unsatisfied in India; and that the executor there has no beneficial interest under the will. The case is presumed to be such, that if the plaintiff were before the proper court in Bengal, with this bill, such court would be bound to decree distribution. It is no answer to the plaintiff, that her bill calls on the court to apply the laws of another country. Courts apply those laws in many cases. The sessions did this in Bruce v. Bruce. The master of the rolls did the same in Kilpatrick v. Kilpatrick. The court of Pennsylvania applied the law of Delaware in Guier v. O'Daniel, 1 Bin. 349. So far there can be no difficulty or doubt in the case. A decree for the plaintiff must be resisted, if it can be resisted at all, on the ground, that there being an existing administration, in loco domicilii, the effects collected elsewhere, must, in all cases, be remitted to the hands of the administrator or executor there, to be by him distributed. This is contended for as a universal rule; subject, however, to one exception, which is, that creditors here have a right to be paid here, out of the funds. Is there any such universal and inflexible rule? The plaintiff contends there is not. The law on this subject may be considered as of modern origin. It arises from comity, and from the regard, which courts of one country pay to the pri-

vate rights of the citizens or subjects of another country. But a rule, in the extent contended for, is not required by any of the reasons, in which the general doctrine or general practice is founded. The property is to be remitted, when any purpose of substantial justice requires it. But if the rightful owner be here, why should it be sent abroad for no reason, but to send him after it? The case under discussion supposes the plaintiff entitled to this property, and that if sent to India, and she were to follow it thither, it could not be refused to her. If the fund were wanted in India for any purpose of the will; or if any person there had rights in it, or claims upon it, the case would be different. But as the fund is here, and as the plaintiff, a citizen of this country, is entitled to it; and as this court is competent to distribute it, comity cannot require from this court the compliment of deferring the cause to the jurisdiction of the court in India. This is not required by that regard to the rights of individuals, subjects of other countries, which has governed the decisions of courts in these cases. And, that regard to these rights, is the foundation, upon which courts proceed in such cases, is proved perhaps by the circumstance, that no case is mentioned, probably none exists, in which the government of one country claims property in another, as escheating to itself. The courts of this country would remit this property to England or to India, to answer the claims of legatees or next of kin there. But they would not remit it for the benefit of the British exchequer, if there were no legatees or next of kin.

If, then, the question be not a technical one about the jurisdiction of the court, but of justice and private right, should it not appear, that some purpose of right or justice is to be answered by remitting the property to India? If there is no known and fixed principle, requiring the rule to be carried to the extent mentioned, the court will look to the consequences of adopting it in that extent. Many cases of inconveniences have been stated on the other side, which might happen, if the court should distribute personal property, found here, and belonging to one dying abroad. And no doubt there are cases, in which convenience, as well as justice would require the fund to be remitted. But the question is, whether this must be done, and in all cases? Or, on the other hand, whether the court may not do that, in each case, which the justice of that case shall require? A man might die in India, domiciled there, leaving the bulk of his property, and all his creditors, next of kin, and legatees, here. There may be nothing to be done in India, but collect debts due to the estate. Those may be here, who are entitled to the whole. Shall it all, nevertheless, be sent to India? If not, then there is no such universal rule as has been supposed. There are many cases, in which decisions have been made inconsistent with the existence of any such

rule. One is, where persons dying abroad leave executors, both abroad and in England. The executor in England is bound to distribute what comes to his hands. He is not merely to collect the effects, and remit them to the executor acting in loco domicilii. Brooks v. Oliver, Amb. 406, appears to be a case of this sort. So is Chetham v. Lord Audley, 4 Ves. 72. Another case is, where the will is proved in both countries. Nisbett v. Murray, 5 Ves. 149. Cooper says, "The municipal courts of this country will also, by a principle of the law of nations, in the case of strangers leaving property here, distribute that property, in the case of death, by the laws of their own country, provided such stranger is not domiciled here." Coop. Eq. Pl. 121. He makes no exception for the case of there being another administrator or executor in loco domicilii. All these cases and opinions seem to be wrong, if the law be, as stated in one of the cases relied on by the other side (Dawes v. Boylston, 9 Mass. 355); viz. that all effects and choses in action, wherever collected, must be accounted for and finally administered in the country, where the deceased had his domicile. The rule is not laid down to that extent, in any other case, or by any writer. The administration in loco domicilii may be, and in cases arising in the East and West Indies, very often is, considered as a mere agency. In Chetham v. Lord Audley, Lord Loughborough says: "I think the appointment of an executor in India, no legacy being given to him, is the appointment of an agent for the management of the estate. They give them the character of executors." In such a case, the creditors and legatees, or next of kin being in another country, the India administration should, from the nature of the case, be considered as auxiliary to the uses of the property and the interest of those concerned. It should be accessory to that administration, which exists, where those are, who have a right to the property.

In Jauncy v. Sealey, 1 Vern. 397, there seems to be no objection to calling the administrator loci domicilii to account to the administrator in England, provided there had been effects in England. Tourton v. Flower is to the same point. These cases are incompatible with the existence of a rule, which renders the administration in loco domicilii in all cases the leading one, and treats the other as entirely subordinate. Indeed there will hardly be found to be any such rule, as that where there are two administrations on one estate, existing in different independent countries, one must be considered in all cases as principal, and the other as merely auxiliary and subordinate. Strictly speaking, no such relation can exist between authorities derived from different sources. Each administration is independent of the other; the power of administering issues from different and independent origins. Courts of law and equity will compel admin-

istrators, who act in an official capacity, so to act as to answer the ends of justice; and for this purpose they will, if necessary, hold an administrator in one country to be trustee of an executor or administrator in another country. But then a case must be made out, in which justice and equity require this. There may be administrations with equal claims to be considered single and independent. Suppose a man domiciled in England, to make his will there, leaving property both there and here. He may give a legacy to a person here, charged on the property here, and a legacy to a person in England, charged on the property there; and he may appoint executors in both countries. Should the legatee here be referred in such case to England for payment? Or suppose that there were, in such case, only the English executor, and he should come here, prove the will, and obtain the property by the aid of the laws of this country, could he not then be compelled to pay the legacy here? If we go one step further and suppose, that instead of coming with the will, he should send it, and it should be proved, and administration granted, at his request, to some one, with the will annexed, and then suppose further, that instead of a legatee applying for a legacy, the next of kin apply here for a surplus, we have the present case. A will might be made abroad, which could be only executed here. It might charge annuities or the maintenance of infants or relatives on the funds in this country, and be made payable on contingencies, which could be known and ascertained nowhere else. It might direct property to be invested in stock here, for the purposes of the will. A testator in England, having property here, might bequeath it to charitable purposes here. Such a trust must be enforced here or nowhere; because the English court of chancery has declined to enforce the execution of a charity in favor of objects existing under a foreign government. Attorney-General v. City of London, 3 Brown, Ch. 171.

A principal case relied on by the counsel for the defendant is Pipon v. Pipon. As to that case, it may be remarked 1st. That the plaintiff there had clearly no right. 2dly. That the plaintiff did not ask for distribution according to the laws of Jersey. Lord Hardwicke seemed to think something remained to be done in Jersey. Nothing can be proved by that case, except that the succession is to be governed by the law of the domicile. It has been said, that from an expression of the master of the rolls in Somerville v. Lord Somerville, it may be inferred, that he would remit the funds for distribution to the court of the domicile, instead of distributing them himself. "The country," he says, "in which the property is, would not let it go out of that, until it knew by what rule it is to be distributed." But this expression cannot warrant the inference drawn from it. And in the very cases in which it

was used, the master of the rolls appears to have decreed distribution according to the laws of Scotland. In Dawes v. Boylston it is said, that creditors here are to be paid before the fund is to be remitted. This is stated without qualification, and without reference to the case of other creditors existing abroad. This exception opens a door to all the inconveniences, which have been stated, and to great injustice in many cases; because the greater part of the property might be here, while the greater amount of debts might be abroad, and the whole estate insufficient to pay all. And it is not easy to see, why the next of kin, there being no debts, have not as well founded a right to the property, as creditors, where there are debts. So also of legatees. It is not matter of favor, in courts of equity, to compel the payment of legacies, or to decree distribution; nor have they any broader discretion in such cases than in the payment of debts. It is difficult to perceive the reason, why debts are to be paid, and legacies not paid, or the surplus not distributed. By the law of England assets are to be marshalled, and judgments and bond debts are to be paid before debts by simple contract. If a simple contract creditor be found here, his debts having been contracted in India, and with reference to the laws of that country, may he obtain satisfaction out of the funds here, and leave judgment creditors and bond creditors unpaid in India? It would seem at least to be equitable, that debts contracted in India should be paid according to the laws of India, wherever the fund might be found. A general rule, that all debts asserted here, wherever contracted, should in all cases be paid out of the funds here, would seem to be as objectionable, as the supposed rule, that legatees and next of kin must, in all cases, resort to the forum of the domicile. It is possible, that the judges in Dawes v. Boylston might have felt themselves restrained by the nature of the jurisdiction, which they were exercising. They might not consider themselves as possessed of all the power of a court of equity. If there were no inconvenience of that sort, and if the merits of the case had required it, I am not able to see, why a decree might not have been made in that case in favor of the inhabitants of Boston. A conclusive reason in favor of such decree would seem to be, that if the will of the testator could not be enforced in that particular, by the court here, it could not be enforced at all, and the testator's object would be wholly defeated. In the subsequent case of Stevens v. Gaylord, the same court appear not to have considered any rule established in Dawes v. Boylston. The court in that case says: "If it should appear upon due examination in our probate court, that Tilbalds had his home in Connecticut, we should cause the balance, remaining in the hands of the administrator here, to be distributed according to the laws of Connecticut, or transmitted for distribu-

tion by the administrator in Connecticut, under the decree of the court there." This language is not consistent with the supposition, that the court had either found or made a rule, requiring a transmission of the fund in all cases. I consider, therefore, that the decisions in the supreme court of this state, taken together, have established no such rule as the defendant contends for.

If no settled rule has been shown, by which the plaintiff must be referred to India for distribution, there is no principle of equity opposed to granting her relief here. The defendant professes to be trustee for the executors in India, and the case is such, that if the executors in India shall receive the money, they will be trustees for the plaintiff. Then why may not the plaintiff treat the defendant as her trustee, and claim the money directly from him? There is no question about sufficient parties. The executors in India have had notice of this suit, and the defendant represents them in it. A decree here will protect him against them. He has collected this fund through the assistance of the judicial tribunals of this country; and if he shall now distribute under their decree, he cannot be made further answerable to any body.

STORY, Circuit Justice. The question, which has now been argued, lies at the very foundation of the plaintiff's suit, and is of great importance and no inconsiderable difficulty. I have taken time to consider it; and after a full consideration of all the authorities, commented on with so much learning and ability by the counsel, I am now to pronounce the result of my own judgment on the case. For the purposes of the argument, it is assumed or conceded, that the testator (dying intestate as to the residue of his estate, of which distribution is now sought) was at his decease domiciled at Calcutta, in the East Indies; that his will has been duly proved, and administration there taken upon his estate by his executor; that the defendant has under the directions of that executor taken administration of the testator's estate in Massachusetts, and in virtue thereof has received a large sum of money, which now remains in his hands; that no part of this money is wanted at Calcutta for the payment of any debts or legacies under the will; and that the plaintiff is a citizen of Rhode Island, and domiciled there; and, as one of the next of kin of the testator, is entitled to a moiety of the undevised residue of the testator's estate. The question then is, whether, under these circumstances, this court as a court of equity can proceed to decree an account and distribution of the property so in the hands of the defendant; or is bound to order it to be remitted to Calcutta, to be distributed by the proper tribunal there.

There are some points involved in the argument, which may be disposed of in a few words. In the first place the distribution, whether made here or abroad, must be according to the law of the place of the testator's domicile. This, although once a question vexed with much ingenuity and learning in courts of law, is now so completely settled by a series of well considered decisions that it cannot be brought into judicial doubt. Vatt. b. 2, c. 8, § 110; Denizart, voce "Domicil," §§ 3, 4; Voet, lib. 38, tit. 17, § 34; Vinn. Sel. Quest. lib. 2, c. 19; Van Leeouen, Censura Forensis, lib. 3, c. 12; Hub. par. 1, lib. 3, tit. 13, § 20, sub finem; Id. par. 2, lib. 1, tit. 3, § 15; Bynkershoek, Quest. Priv. Juris, lib, 1, c. 16, pp. (Ed. 1767, folio) 334, 335; Kaimes, Pr. Eq. b. 3, c. 8, § 4; Ersk. Inst. b. 3, tit. 9, § 4; Pipon v. Pipon, Amb. 25; Burn v. Cole, Id. 415; Thorne v. Watkins, 2 Ves. Sr. 35; Bruce v. Bruce, 2 Bos. & P. 229, note; 6 Brown, Parl. Cas. 566; Balfour v. Scott, Id. 550; Bempde v. Johnstone, 3 Ves. 198; Sill v. Worswick, 1 H. Bl. 690; Hog v. Lashley, 6 Brown, Parl. Cas. 577; Drummond v. Drummond, Id. 601; Phillips v. Hunter, 2 H. Bl. 402; Hunter v. Potts, 4 Term R. 182; Somerville v. Lord Somerville, 5 Ves. 750; Dixon's Ex'rs v. Ramsay's Ex'rs, 3 Cranch [7 U. S.] 319; Goodwin v. Jones, 3 Mass. 514; Richards v. Dutch, 8 Mass. 506; Dawes v. Boylston, 9 Mass. 337; Desesbats v. Berquier, 1 Bin. 336; Guier v. O'Daniel, Id. 349, note; Potter v. Brown, 5 East, 124. In the present case, the law of Calcutta, or rather of the province of Bengal. is, as I apprehend, the law of England; and as that is the same as the law of Massachusetts, the distribution would be the same, as if the testator had died domiciled here. In the next place, the court of chancery has an ancient and settled jurisdiction to decree an account and distribution of a testator's and an intestate's estate, on the application of the legatees or next of kin (Matthews v. Newby, 1 Vern. 133; Howard v. Howard, Id. 134; Goodwin v. Ramsden. Id. 200; Winchelsea v. Norcloffe, 2 Ch. R. 367; Mitf. Pl. Ch. 114; Coop. Eq. Pl. 39, 127); and supposing this to be a fit case for the application of its authority, the present suit would fall completely within that jurisdiction. In the next place. the equity powers and authorities of the courts of the United States are, in cases within the limits of their constitutional jurisdiction, co-equal and co-extensive, as to rights and remedies, with those of the court of chancery. The present is a suit between citizens of different states, over whom this court has an unquestionable right to entertain jurisdiction; and it will follow of course, that the plaintiff is entitled to the relief she prays for, if it be competent and proper for any court of equity to grant it.

Having disposed of these preliminary points, we may now return to the consideration of the great question in controversy. Stated in broad terms it comes to this, whether a court of equity here has competent authority to decree distribution of intestate property collected under an administration granted here, the intestate having died domi-

ciled abroad, and the distribution being to be made according to the law of his foreign domicile. The counsel for the defendant deny such authority under any circumstances; the counsel for the plaintiff as strenuously assert it.

This is a question involving the doctrines of national comity, or, what may be more fitly termed, international law. And looking to it as a question of principle, it would not seem to be attended with any intrinsic difficulty. The property is here, the parties are here, and the rule of distribution is fixed. What reason then exists, why the court should not proceed to decree according to the rights of the parties? Why should it send our own citizens to a foreign tribunal to seek that justice, which it is in its own power to administer without injustice to any other person? I say without injustice, because it may be admitted, that a court of equity ought not to be the instrument of injustice; and that if in the given case such would be the effect of its interposition, it ought to withhold its arm. This, however, would be an objection, not to the general authority, but to the exercise of it under particular circumstances. The argument, however, goes the length of denying the existence of that authority, whatever may be the circumstances of the case. Yet cases may be readily imagined, in which it might not be inequitable to interfere, nay, in which there might be very cogent reasons for interference. Suppose there are no debts abroad, and no heirs or legatees abroad, but all are here, and apply to the court for a decree of distribution; is the court bound to remit for the vain purpose of putting the legatees or distributees to great expense and delay in seeking their rights in a foreign tribunal? Suppose two executors are appointed by the testator, one abroad and one here (and such cases are not uncommon)—Chetham v. Lord Audley, 4 Ves. 72; De Mazar v. Pybus, Id. 644,—and the bulk of the property is collected here, and all the legatees are here; shall the court direct the domestic executor to remit the whole property to the foreign executor, because it is to be distributed according to the law of the foreign domicile? Suppose further, the executor here is himself the residuary legatee, or, in case of intestacy, the administrator here is the next of kin, and entitled to the surplus; shall he be required to remit the property abroad, that he may be there decreed to receive it again? Suppose legacies, payable out of particular funds here, or a specific legacy of property here, shall not the legatee be entitled to recover of the administrator or executor here, because the testator was domiciled in a foreign country? Suppose a legacy to charitable uses in this country, good by our law, but which, from motives of policy, the courts of the foreign country decline to enforce; shall it be said, that our courts are bound to enforce, by remitting the property there, a policy, by which they are injured?

Whatever may be thought of the last case, there can be no doubt, that the others present circumstances, where equity would strongly persuade us, that it would be the duty of our courts to entertain jurisdiction, and decide on the rights of the parties. There are many other cases, in which it would seem fit to vindicate and assert the proper rights of our citizens and our own laws. This very case, under one aspect, would have presented a question, of which our own tribunals might as justly have claimed an exclusive cognizance, and which, I trust, they would have decided with as much impartiality, as the tribunals of the testator's domicile. Major Murray was an American citizen, born in Rhode Island; and if he left no lawful heirs (as has been argued in a former part of this case), his property here, supposing he had acquired no foreign domicile, would have undoubtedly fallen as an escheat to that state; and it would deserve consideration, whether the change of domicile would work any alteration in that respect. Under such circumstances, would it be proper to send the state of Rhode Island to solicit its rights from a foreign tribunal in the East Indies?

One objection urged against the exercise of the authority of the court is, that as national comity requires the distribution of the property according to the law of the domicile, the same comity requires, that the distribution should be made in the same place. This consequence, however, is not admitted; and it has no necessary connexion with the preceding proposition. The rule, that distribution shall be according to the law of the domicile of the deceased, is not founded merely upon the notion, that moveables have no situs, and therefore follow the person of the proprietor; even interpreting that maxim in its true sense, that personal property is subject to that law, which governs the person of the owner. Sill v. Worswick, 1 H. Bl. 690. Nor is it, perhaps, founded upon the presumed intention of the deceased, that all his property should be distributed according to the law of the place of his domicile, with which he is supposed to be best acquainted and satisfied; for the rule will prevail even against the express intention of the deceased, unless the mode in which that intention is expressed, would give it legal validity as a will. Desesbats v. Berquier, 1 Bin. 366; 2 Hub., b. 1, tit. 3, § 4. It seems, indeed, to have had its origin in a more enlarged policy, founded upon the general convenience and necessities of mankind; and in this view the maxim above stated flows from, rather than guides, the application of that policy. The only reason, why any nation gives effect to foreign laws within its own territory, is the endless embarrassment, which would otherwise be introduced in its own intercourse with foreign nations. The rights of its own citizens would be materially impaired, and, in many instances, totally extinguished by a refusal to recognise and sustain the doctrines of for-

eign law. The case now under consideration is an illustration of the perfect justice and wisdom of this general practice of nations. A person may have moveable property and debts in various countries, each of which may have a different system of succession. If the law rei sitae were generally to prevail, it would be utterly impossible for any such person to know in what manner his property would be distributed at his death, not only from the uncertainty of its situation from its own transitory nature, but from the impracticability of knowing, with minute accuracy, the law of succession of every country, in which it might then happen to be. He would be under the same embarrassment, if he attempted to dispose of his property by a testament; for he could never foresee, where it would be at his death. Nay more, it would be in the power of his debtor, by a mere change of his own domicile, to destroy the best digested will; and the accident of a moment might destroy all the anxious provisions of an excellent parent for his whole family. Nor is this all. The nation itself, to which the deceased belonged, might be seriously affected by the loss of his wealth, from a momentary absence, although his true home was in the centre of its own territory. These are great and serious evils, pervading every class of the community, and equally affecting every civilized nation. But in a maritime nation, depending upon its commerce for its glory and its revenue, the mischief would be incalculable. The common and spontaneous consent of nations, therefore, established this rule from the noblest policy, the promotion of general convenience and happiness, and the avoiding of distressing difficulties, equally subversive of the public safety and private enterprise of all. It flowed from the same spirit, that dictated judicial obedience to the foreign commissions of the admiralty. "Sub mutuae vicissitudinis obtentu, damus petimusque vicissim," is the language of the civilized world on this subject. There can be no pretence, that the same general inconvenience or embarrassment attends the distribution of foreign effects according to the foreign law by the tribunals of the country, where they are situate. Cases have been already stated, in which great inconvenience would attend the establishment of any rule, excluding such distribution. It may be admitted also, that there are cases, in which it would be highly convenient to decline the jurisdiction, and to remit the parties to the forum domicilii. Where there are no creditors here, and no heirs or legatees here, but all are resident abroad, there can be no doubt, that a court of equity would direct the remittance of the property upon the application of any competent party. The correct result of these considerations upon principle would seem to be, that whether the court here ought to decree distribution, or remit the property abroad, is a matter, not of jurisdiction, but of judicial discretion, depending upon the particular circumstances of each case. That there ought to be no universal rule on the subject; but that every nation is bound to lend the aid of its own tribunals for the purpose of enforcing the rights of all persons having title to the fund, when such interference will not be productive of injustice or inconvenience, or conflicting equities.

It is farther objected, that a rule, which is to depend for its application upon the particular circumstances of each case, is too uncertain to be considered a safe guide for general practice. But this objection affords no solid ground for declining the jurisdiction, since there are an infinite variety of cases, in which no general rule has been or can be laid down, as to legal or equitable relief, in the ordinary controversies before judicial tribunals. In many of these, the difficulty is intrinsic in the subject matter; and where a general rule cannot easily be extracted, each case must, and indeed ought to, rest on its own particular circumstances. The uncertainty, therefore, is neither more nor less than what belongs to many other complicated transactions of human life, where the law administers relief ex aequo et bono.

Another objection, addressed more pointedly to a class of cases, like the present, is the difficulty of settling the accounts of the estate, ascertaining the assets, what debts are sperate, what desperate, and, finally, ascertaining what is the residue to be distributed, and who are the next of kin entitled to share. And to add to our embarrassment, we are told, that we cannot compel the foreign executor to render any account in our courts. I agree at once, that this cannot be done, if he is not here. But I utterly deny, that the administrator here cannot be compelled to account to any competent court for all the assets, which he has received under the authority of our laws. And if the foreign executor chooses to lie by, and refuses to render any account of the foreign funds in his hands, so far as to enable the court here to ascertain, whether the funds are wanted abroad for the payment of debts or legacies or not, he has no right to complain, if the court refuses to remit the assets, and distributes them among those, who may legally claim them. And as to settling the estate, or ascertaining who are the distributees, there is no more difficulty than often falls to our lot in many cases arising under the ordinary probate proceedings.

All these objections are, in fact, reasons for declining to exercise the jurisdiction in particular cases, rather than reasons against the existence of the jurisdiction itself. It seems, indeed, admitted by the learned counsel for the defendant, that if there be no foreign administration, it would be the duty of the court to grant relief upon an administration taken here. Yet every objection, already urged, would apply with as much force in that as in the present case. The property would be to be distributed according to the

foreign law of the deceased's domicile. The same difficulty would exist, as to ascertaining the debts and legacies, and the assets and distributees entitled to share. But it is said, that in the case now put, the administration here would be the principal administration, whereas in the case at bar, it is only an auxiliary or ancillary administration. I have no objection to the use of the terms principal and auxiliary, as indicating a distinction in fact as to the objects of the different administrations; but we should guard ourselves against the conclusion, that therefore there is a distinction in law as to the rights of parties. There is no magic in words. Each of these administrations may be properly considered as a principal one, with reference to the limits of its exclusive authority; and each might, under circumstances, justly be deemed an auxiliary administration. If the bulk of the property, and all the heirs and legatees and creditors were here, and the foreign administration were only to recover a few inconsiderable claims, that would most correctly be denominated a mere auxiliary administration for the beneficial use of the parties here, although the domicile of the testator were abroad. The converse case would of course produce an opposite result. But I am yet to learn, what possible difference it can make in the rights of parties before the court, whether the administration be a principal or an auxiliary administration. They must stand upon the authority of the law to administer or deny relief, under all the circumstances of their case, and not upon a mere technical distinction of very recent origin.

I have already intimated my opinion as to the true principle, that ought to regulate cases of this nature; and I have endeavoured to answer the most pressing objections, satisfactorily at least to my own mind. If, therefore, the question were res integra, I should have no difficulty in deciding, that whether distribution ought or ought not to be decreed, should depend upon the circumstances of each case; that no universal rule ought to be laid down on the subject; or at least, that the rule should be flexible, and depend for its application upon the equity of the particular case presented to the court. But it is said, that the case no longer stands upon general principles; and that the doctrine has passed in rem judicatam. If it be so, it will be my duty, as well as my inclination, to submit to authority; for nothing can be more dangerous than, upon private doubts, to disturb the landmarks of the law. Several cases have been cited from the Massachusetts Reports upon this subject. The first case is Selectmen of Boston v. Boylston, 2 Mass. 384, in which the court held, that an administrator with the will annexed of a foreign testator is not bound, upon taking administration here under our statute (St. June 24, 1785, c. 12), to account for any property received by him abroad under the foreign administration. And the court relied upon the express language of the statute, that the judge of probate in such cases may take bonds, "or grant administration of the said testator's estate lying in this government, with the will annexed, and settle the said estate in the same way and manner, as by law he may or can upon the estates of testators, whose wills have been duly proved before him." The whole reasoning of the court manifestly proceeds upon the supposition, that as to the estate here, the judge of probate may proceed to settle it, like other estates; and so certainly is the language of the statute. The case then is, as far as it goes, an authority against the defendant. Soon afterwards the same case came again before the court (Selectmen of Boston v. Boylston, 4 Mass. 318), when it was distinctly held, that the administrator was bound to account before the probate court for the effects here at the suit of the appellants, who were residuary legatees. S. P. Jauncy v. Sealey, 1 Vern. 397. On that occasion the court said, the administration here "is to be considered, not only as a means of collecting the effects of the deceased within this jurisdiction, but of answering, according to the rules of the same jurisdiction, the demands of creditors and all legal liens upon those effects. By the will, under which the administrator is acting, it appears, that the appellants are residuary legatees. They have, therefore, a direct and immediate interest in the account of the administrator, and in every process, which can be instituted, to determine the amount of the effects collected, and the charge, to which they are liable; or, in other words, of obtaining the residuum of T. B.'s (the testator's) effects within this jurisdiction." With respect to the merits of the decree in this case, it is no part of my business to enter into any discussion. But it is most manifest, that the court did contemplate, that the administrator was bound fully to account here, not only to creditors, but to all others entitled to the fund, as next of kin, or residuary legatees. And if the court had been then of opinion, that it was bound to remit the proceeds abroad at all events, it seems difficult to conceive any substantial grounds, upon which their decree rested. For if the account was to be taken here, and then the balance in the hands of the administrator remitted, it would still be necessary to take the account again in the foreign jurisdiction; and if that jurisdiction could reach all the effects received here, as well as abroad, what was done here could not be conclusive upon it. And if the foreign tribunal could not, in virtue of the original grant of administration, compel the administrator to account for effects received here by the exercise of its ordinary powers, (for I speak not here of the extraordinary powers of a court of chancery,) the legatees would be without relief in both jurisdictions. This case came again before the court in a suit brought under the direction of the court upon the probate bond of the administrator. Dawes v.

Boylston, 9 Mass. 337. In the intermediate time, however, the court in Richards v. Dutch, 8 Mass. 506, decided generally, without assigning any reasons, that under St. 1785, c. 12, the administrator may be held to pay debts to creditors here, if any such are claimed of him; but that legatees, who claim only from the bounty of the testator, must resort to the country of the testator, where the will was originally proved, and by the laws of which his effects are to be distributed, to obtain the bounty they claim. Accordingly this doctrine was recognised in Dawes v. Boylston, Mr. Justice Sewall (who seems to have been the only judge, who sat upon its final decision) declaring, "that the rights of legatees, especially residuary legatees, as well as of the next of kin in a case of intestacy, depend upon the laws of the country, where the deceased had his home and domicile, from whom the bequest or succession is claimed; and to that purpose, all the choses in action are to be deemed local, to be there accounted for and finally administered, wherever collected, or accruing in possession to the executor or administrator." And farther, that the administrator, by virtue of his administration here, "has an authority to collect and pay debts, and is liable for the contracts and duties of the testator recoverable, and which may be enforced within this jurisdiction; but is not liable, in the court of probate, upon any partial account to be there rendered and adjusted, to a decree either of payment or distribution, whether for a legacy, or to any claiming by a supposed succession, of the deceased's effects." And farther, that the jurisdiction abroad is "exclusive in whatever regards the final settlement of the estate, the ascertaining of the residue after payment of the debts, and the appointment and distribution thereof." The decision of the court upon the whole view of the case, was, that the administrator was compelled to render an inventory and account to the probate court of the assets received here; and that his refusal so to do was a breach of the probate bond; but that the residuary legatees were not entitled to any farther relief.

It has been supposed by the plaintiff's counsel, that this doctrine has been shaken in a more recent case (Stevens v. Gaylord, 11 Mass. 256), where the court, adverting to the facts, said: "If it should appear upon due examination in our probate court, that T. (the deceased) had his home in Connecticut, we should cause the balance remaining in the hands of the administrator here, to be distributed according to the laws of Connecticut, or transmitted for distribution by the administrator in Connecticut, under the decree of the probate court there." But I cannot perceive in this language any sufficient warrant to justify me in the conclusion, that it was meant to overturn, or bring into doubt, two solemn decisions of the court. I feel myself compelled, therefore, (very reluctantly, I confess,) to admit, that by the law of Massachusetts the probate courts have no jurisdiction, either originally or by a suit on the probate bond, to compel a final settlement or distribution of the estate of a foreigner, whose assets have been collected here under what is called, an "ancillary" or "auxiliary" administration. And if this were a case depending upon the local law of the state, so conclusive should I deem it upon me, not only from the learning and authority of the court itself, but from the necessity of holding, upon principles of public convenience and policy, the judicial construction of state tribunals upon their own laws conclusive upon all other tribunals, that I should not scruple to adopt it in its whole extent, whatever might be my own doubts on the subject. But the case here does not depend upon the local law of Massachusetts. Although a court of probate of that state can administer no relief in virtue of its statutable powers, it does not follow, that a court of chancery cannot in the exercise of its equitable jurisdiction; for the equity powers of such a court must be judged of by its own principles applied to its own organization, and not by the limited rules applied to ecclesiastical tribunals. Besides; the question here is properly a question of international law, dependent upon no local usages, but resting on general principles. The parties are citizens of different states, and their rights must be decided, not merely by the authority of one state, but by principles applicable to all states. Whether, therefore, we are to decide by the doctrines of Massachusetts, or by the opposing doctrines of other states, must depend upon the reasons, upon which those doctrines are respectively built. That a contrariety of opinion exists is most manifest, since the courts of Pennsylvania sustain jurisdiction in cases like the present, and decree distribution to the next of kin according to the law of the place of his domicile. Guier v. O'Daniel, 1 Bin. 349, note. And see, also, Desesbats v. Berquier, Id. 336.

In this state of embarrassment, it would have been a great relief to my mind, if the reasons, on which the state court of Massachusetts proceeded, had been expounded with the usual fulness. But no reasons are given for this particular doctrine. Nor do all the authorities which have been cited on the present argument, appear to have been brought in review before that court. There is, too, a qualification of its doctrine in favor of creditors, the ground of which it would have been most desirable to ascertain. Why should not legatees and distributees be entitled to recover out of the assets here, as well as creditors? It is true, that legatees claim by the bounty of the testator; but it is a legal right, as fixed and vested as the right of the creditor. And, as to distributees, the case is still stronger; for that rests not on the bounty of the intestate, but on the law of the land, which, at the same time, enables the creditor to receive his debt out of the assets, and the next of kin to claim the residue. If it be

said, that it belongs to the public policy of a country to sustain the claims for debts due to its citizens, it seems to me no less to belong to that policy to sustain any other claims of its citizens, which are founded in justice and law. If it be said, that the assets are to be distributed by a foreign law, and it is very difficult and laborious to learn, what that law is, and to apply it correctly, the same objection applies to the payment of debts. The priority of debts, the order of payment, the marshalling of assets for this purpose, and, in cases of insolvency, the mode of proof as well as of distribution, differ in different countries. And if in case of debts, the court here is to apply the lex domicilii, the same embarrassment will arise, as in other cases of distribution to the next of kin. There is no more difficulty in the order of payment of legacies, than of debts. And courts of law must, in these cases, ascertain and apply the foreign law precisely in the same manner they do in other cases. Feaubert v. Turst, Finch, Prec. 207, 1 Brown, Parl. Cas. 129; Fremoult v. Dedire, 1 P. Wms. 429. I pressed the learned counsel for the defendant, at the argument, for a solid ground, on which to sustain the distinction in ·favor of creditors, either upon principles of national comity, or public convenience, or substantial justice. I heard no vindication of it in either view. And cases may readily be imagined, in which such a distinction might work injustice. Suppose by the lex domicilii, the debts are primarily a charge on the realty, and not on the personal estate; shall the creditor here be permitted to exhaust the personal assets here, when the succession to the real and personal estate may be different in the foreign country? Suppose the assets abroad and at home have a different order of succession or distribution, shall the creditor here be permitted to defeat that order?[2] If not, then the court here must apply the lex domicilii to protect the heirs; and must ascertain the nature and extent of that law (vide Bowaman v. Reeve, Finch, Prec. 577); and if so, why not proceed to distribute the property among those, who are the cestuis que trust entitled to it. The case was very properly put at the argument, whether a court here could refuse here to sustain a suit by a cestui que trust against his trustee here, simply because the trust originated in, and was to be governed by, the law of another country. It was admitted, that it could not; and so certainly are the authorities. Feaubert v. Turst, Finch, Prec. 207, 1 Brown, Parl. Cas. 129; Fremoult v. Dedire, 1 P. Wms. 429. But it was said, that the administrator here is a trustee for the administrator abroad, and not for the next of kin; and that the cestuis que trust cannot follow the property in the hands of a mere

agent of the trustee. These positions, in their general latitude, are certainly not well founded. The administrator here is not a mere agent of the administrator abroad. He collects and receives the assets in his capacity as administrator generally; and so far as it may be wanted for payment of debts and legacies, he holds it in trust for the creditors and legatees, and as to the residuum in trust for the next of kin. And even if he were a mere agent of a trustee, the cestuis que trust would be entitled to claim the fund directly from him; for a court of equity may follow a trust fund in whosesoever hands it may be found. Newland v. Champion, 1 Ves. Sr. 105; Doran v. Simpson, 4 Ves. 651. Could the administrator abroad sue the administrator here to recover the assets collected here? .I apprehend not. The creditors, legatees, and heirs, are the only persons competent to sue in respect to their own interests; and the administrator, as such, could have no remedy. See Stevens v. Gaylord, 11 Mass. 256. I confess myself unable to admit the distinction in favor of creditors, without admitting, at the same time, the like rights in ·favor of legatees and heirs. Nor have I been able to find that distinction sustained or adverted to in any other authorities.

It remains to examine the English decisions upon the point now before the court. The earliest case, which I have met with, is Bowaman v. Reeve, Finch, Prec. 577, which was a suit brought by specific legatees of a person domiciled in Holland against the executor and residuary legatee, who had taken out letters of administration, to recover satisfaction out of such residuum for the value of their specific legacies, which had been taken possession of by the creditors in Holland in payment of their debts; and the chancellor decreed satisfaction accordingly, and did not remit the legatees for relief to the domestic forum. Next followed Tourton v. Flower, 3 P. Wms. 369; but there no such objection was raised; and the case went off upon another ground, viz. the want of competent parties to sustain the suit against the English administrator. Then came the case of Pipon v. Pipon, Amb. 25; Id. (Blunt's Ed.) append. "D," Lord Hardwicke's opinion is given from Sergt. Hill's MSS. It was a bill in equity, brought by the plaintiffs as representatives of several sisters of the intestate, against the defendants, who were his sisters, and had taken administration of the intestate's estate in London, and had received a bond debt of 500L due there. The suit was for a distribution of the 500l.; and the question was, whether it should be distributable according to the laws of England, it being found within the province of Canterbury, in which case the plaintiffs would be entitled to a part? Or whether it should be distributed according to the laws of Jersey, where the intestate resided at the time of his death, in which case the plaintiffs by those laws would not be entitled to any part of it? Lord Hardwicke dis-

---

[2] There are some curious cases of this conflict of rights growing out of the laws of different countries. See Anandale v. Anandale, 2 Ves. Sr. 381; Balfour v. Scott, 6 Brown, Parl. Cas. 560; Drummond v. Drummond, Id. 601.

missed the bill, and is reported to have said: "I should be very unwilling to go into the general question, for it is very extensive. This is merely the case of a debt. The question, then, is, whether the plaintiffs, as next of kin, have a right to call for an account of this part of the residue only? And I think there is not sufficient ground for it. If I were to go into the general question, the personal estate follows the person, and becomes distributable according to the law or custom of the place, where the intestate lived. The words of the statute are very particular, viz. the residue undisposed of is to be distributed, so that the plaintiffs are wrong in coming into this court for an account of only part; for by that statute, an account must be decreed of the whole, and the general administrator is not before the court." I cannot help suspecting, that there is some error in the language here imputed to Lord Hardwicke; for if the distribution was to be according to the lex domicilii, the statute of distributions (St. 22 & 23 Car. II. c. 10), alluded to by his lordship had nothing to do with the case, for it was not governed by the law of England, but of Jersey. And if the distribution was to be by the lex loci rei sitae, then the fund in the hands of the administrator here was the whole residue, which was distributable under the statute. So that, in either way, the reasoning was untenable. The true ground, on which the judgment stands, is that suggested by his lordship himself; the plaintiffs were not entitled, for the assets were distributable according to the law of Jersey, which excluded them from any share. And so the case was understood by Lord Mansfield (Burn v. Cole, Amb. 415), and by Lord Loughborough (Sill v. Worswick, 1 H. Bl. 665, 690), and also by Lord Hardwicke himself, in a subsequent case (Thorne v. Watkins, 2 Ves. Sr. 35). And it may, perhaps, be gathered from this last case, though obscure in its language, that his meaning in the other reasoning was, not that the next of kin might not maintain a bill for a distribution of the residue here, but that to entitle him to maintain such suit, he must show, that he is entitled by the lex domicilii. "It was never thought," said his lordship, alluding to the case of Hanse Towns v. Jacobson [cited in 2 Ves. Sr. 34], "that on the death of a person having those funds, a bill must be brought by the next of kin of a particular part of that personal estate; the rule must be, that a bill must be brought for the whole, according to what I laid down in Pipon v. Pipon; otherwise it would destroy the credit of the funds; for no foreigner would put into them if, because a title must be made up by administration or probate of the prerogative court of England, it was to be distributed different from the laws of his own country." The reason here given shows, that his lordship was referring to a bill by the next of kin claiming against the lex domicilii, and not to a bill by the next of kin claiming by that law.

And surely it will not be pretended, that a person, who by the lex domicilii would be exclusively entitled, as heir, to the residue of the personal estate situate abroad, although not entitled to the residue of the personal estate situate at home, could not maintain a suit for the residue abroad, simply because he could not make title also to the residue at home. Suppose a specific legacy of all the property abroad, shall not the legatee be entitled to claim it here, because he cannot also claim all the property devised to others? Vide Nisbett v. Murray, 5 Ves. 149. Lord Hardwicke certainly did not mean to say, in Thorne v. Watkins, 2 Ves. Sr. 35, that a distribution might not be legally made under a foreign administration; for he says, "it is generally granted on foundation of the administration granted here, and then it must be distributed as here;" not that it must be distributed here. And in that very case he compelled a Scotch executor to account for and distribute funds, which were received by him to be distributed according to the law of Scotland, he being at the same time an English administrator of one of the next of kin, under the Scotch law entitled to share, who died domiciled in England. It is true that the case before the court called for an account of the intestate's estate only; but if Lord Hardwicke had believed, that the account and distribution of the Scotch estate belonged of right to Scotch tribunals only, it seems difficult to believe, that the fact that the administrator was also executor of the Scotch estate, would have made any difference in his decision.

But if Lord Hardwicke's opinion be not susceptible of the explanation, which I have endeavored to give to it, it is not too much to declare, that it is entitled to less weight, than it might otherwise claim, from the very great light, which the learned discussions of more modern times have thrown over the whole subject. In Kilpatrick v. Kilpatrick (cited 6 Brown, Parl. Cas. 584) Lord Kenyon, in a case, where money was in court belonging to a Scotch estate, instead of remitting it to Scotland, decreed distribution according to the Scotch law, giving to the executor, who was also residuary legatee, one moiety, and to the widow the other moiety, which she was entitled to claim by the jus relictae of Scotland. In form the case differs very much from that now before the court; but, in substance, the testator was by the Scotch law intestate as to the moiety of the personal estate, which was decreed to the widow; for of that portion he could not legally dispose by testament. Yet the objection might have been urged there, which Lord Hardwicke is said to have urged in Pipon v. Pipon, that the widow could not sustain a claim for a moiety of this portion of the estate, but ought to bring a bill for a moiety of the whole estate, which could only be in Scotland. In Bruce v. Bruce, 2 Bos. & P. 229, note, and 6 Brown, Parl. Cas. 566, the

whole question was most elaborately discussed, whether the lex rei sitae or the lex domicilii was to prevail in the distribution of intestate property. The case arose in the court of sessions in Scotland, between the heirs claiming by the law of Scotland and those claiming by the law of England; and the court decreed distribution of the property according to the law of England; and this decree was affirmed in the house of lords. During the whole of this discussion, not a doubt was breathed by any one, that the court was competent to decree the distribution. This was followed up by Balfour v. Scott, 6 Brown, Parl. Cas. 550, where the same points were in judgment; and by Hog v. Lashley, Id. 577, where the same principle was applied to testate property. In Bempde v. Johnstone, 3 Ves. 198, there were cross bills filed for distribution by different heirs, according to the law of Scotland and of England; and the question was, where the intestate was domiciled. The lord chancellor decided, that his domicile was in England, and decreed distribution accordingly. In Somerville v. Lord Somerville, 5 Ves. 750, precisely the same question arose; and the master of the rolls, (Sir R. P. Arden,) after a most elaborate argument, decided, that the intestate's domicile was in Scotland, and decreed distribution according to the law of Scotland.

It is remarkable, that the objection, which has been urged at the bar, never occurred, either to the learned counsel or to the court in any of those cases. I can account for it in one way only, and that is, that the law was considered clearly settled, that such a distribution might be made, whenever there were competent parties before the court to require it. It has been stated at the bar, that in all the cases, in which the English courts have decreed distribution, the original executors or administrators were before the court. Whether this be so or not, does not clearly appear in all the cases. But, in my judgment, this circumstance is wholly immaterial. The administrator here is not the less an administrator, because he is not clothed with the same character abroad. If the court can compel a distribution of the assets here, there can be no distinction, whether the person, who administers them, be or be not the original administrator. It is sufficient, that he is the legal and exclusive representative of the deceased, as to those assets. And if, because the foreign administrator is within the jurisdiction, the court will compel him to account and distribute all the assets, foreign as well as domestic, it establishes the authority of the court to an extent greatly beyond what is necessary for the decision of this cause. Vide Nisbett v. Murray, 5 Ves. 149. Chetham v. Lord Audley, 4 Ves. 72.

From this review of the English authorities, there can be no doubt, that the municipal courts of England will, upon a principle of the law of nations, in the case of a stranger, domiciled abroad, and having property in England, distribute that property, in case of death, by the laws of his own country. And so the law is explicitly laid down by one of their best elementary writers. Coop. Pl. Eq. 123.

I have made some researches in the works of foreign jurists, for the purpose of ascertaining, what is the practice of nations governed by the civil law. Those researches have not been very satisfactory; but they leave little room to doubt, that foreign tribunals sustain suits to enforce distribution of assets collected there under auxiliary administrations upon the doctrines so familiar in those courts, that the situs rei, as well as the presence of the party, confers a competent jurisdiction. 2 Hub. p. 2, lib. 5, tit. 1, § 48; 1 Hub. p. 1, lib. 3, tit. 13, § 20, sub finem; 1 Domat, 531, note; Constit. Frederii. Imp. tit. 1, § 10; Bynk. Quest. Priv. Jur. lib. 1, c. 16.

Upon the whole my judgment (though delivered with the greatest deference for a different judgment entertained by others) is, that a court of equity here has authority to decree distribution in cases like the present, according to the lex domicilii, upon the application of the legatees, or the next of kin or other competent parties; that whether it will decree distribution must depend upon the circumstances of each case; and that it is incumbent on those, who resist the distribution, to establish in the given case, that it may work injustice or public mischief. This doctrine is, as I think, sustained by principles of public policy, and is perfectly consistent with international comity. It stands also commended by its intrinsic equity. And although the authorities are not uniformly in its favor, yet they leave the court at liberty to pronounce that judgment, which, if the question were entirely new, it would be disposed to entertain. Vide Toll. Ex'rs. 387; 1 Wood. Lect. 384, 385.