Tucker, P.
This cause has been argued with great ability, and some interesting questions have been presented, which require a fuller discussion than I could wish. I shall proceed to examine them as concisely as I can, without adverting to the facts farther than necessary for the proper understanding of the principles decided.
I shall dismiss the objection to the antiquity of the claim, with the remark that it was put in suit forty years ago, and has been in a course of prosecution ever since, with the exception of an interval of two years subsequent to the dismissal of the bills in the former suits as to Pollard’s administrator. That was not a dismissal on the merits: it was owing to the *25 hopeless insolvency of Pollard’s estate, and the expectation of making the debt due the plaintiffs out of the other defendants. Therefore, it did not operate as a bar; nor can it be regarded either as an abandonment of the claim, or as a blameable laches in the prosecution of it. The suit was renewed against Pollard’s administrator, as soon as the fortuitous recovery of the Spanish claim placed his intestate’s estate in a situation to pay, and it has ever since been pursued, with proper diligence. There is, then, no ground for the objection that the demand is stale, or that the dismissal of the former suits in 1820 is a bar to the further prosecution of the claim.
The next question which arises in the cause is, whether Benjamin Pollard the executor of Camrn G-arlick, is liable to the suit of the plaintiffs in Virginia, he having only proved the will and obtained letters testamentary from the Prerogative Court of Canterbury in England ? Under his authority as executor, he received assets in England to a large amount, which he brought to this country, and wasted; and the suit is brought, not by creditors of Camm Garlick, but by the legatees under his will, demanding a settlement of the executorial account, and a decree for the balance which may be found to be due them. The answer of the executor was filed in the former suits: he set up no pretence of the existence of debts in England, or of any danger to him in paying over the funds in his hands’, or of any conflict between the laws of England and those of Virginia, in relation to the disposition of the assets, nor did he object to the jurisdiction of the courts of Virginia, or to their authority and power to call him to account. The whole- of this matter seems to have been an afterthought of others; and it might, therefore, well be questioned, whether, if such a defence would ever have been a good one, it is now available. But as the *26 geueral question is deeply interesting, and has been argued before the court in this and a former case, Pugh’s ex’or v. Jones, 6 Leigh 299, I prefer to rest the judgment here upon it, rather than upon the particucircumstances appearing in this record.
I am of opinion, that an executor who has qualified and received assets in a foreign country, and has brought them into this jurisdiction, is liable to be sued and to be compelled to account here, although he never has qualified as executor in Virginia, and although he may have received no assets here. I am moreover of opinion) that if suable at all, he is not to be sued as executor de son tort, which he cannot be if he be appointed executor by the testator; the intimation given by me in Pugh’s ex’or v. Jones, of a contrary opinion on this point, I am now satisfied, is erroneous.
In the examination of this question, we shall best proceed by advancing towards the ultimate conclusion step by step. There are certain truths bearing a relation to the question, that cannot be controverted. Thus, it is well established in England, that an executor may be sued before probat, provided he has intermeddled with the assets. Toll. Law Ex’ors 49. Aud this doctrine is admitted to prevail in Virginia, even by those who regard the validity of the disposition of the assets as depending upon a qualification prior or subsequent to such disposition. Munroe v. James, 4 Munf. 199. In such case,- too, of intermeddling, as it is a rightful act, it is obvious, that the party is not suable as executor de son tort, which supposes a tortious intermeddling. If, therefore, Pollard had been appointed executor in Virginia, and received Virginia assets, he would have been liable to be sued, even though he had not qualified. It is also equally clear, I think, that though the will was made in England, yet an executor appointed in Virginia and re *27 ceiving Virginia assets, might he sued here before qualification. And so if the executor was appointed in England, and came to Virginia, without having qualified, and received assets in Virginia, he might be sued here. If Pollard, then, cannot be sued here, it must be either because the assets were foreign assets, or because by qualifying abroad he has bound himself to account there, and there only. It cannot be, that he is protected by the circumstance that the assets were foreign assets; for, having been brought here, they have become Virginia assets, and must be accounted for here, unless by a foreign qualification an exclusive control over them is vested in the foreign jurisdiction. It has been well settled, ever since Dow-dale’s case, 6 Co. 47, that an executor in England receiving assets from abroad, is liable to account for them in England; see Ram on Assets 235, 1 Crompt. & Jerv. 157, 370. And it has never been doubted, I think, that if an executor in Virginia receives from London the proceeds of a crop of tobacco sold there, he must account for them in the settlement of his accounts before our own tribunals. So that, upon the whole, it would seem the only question is, whether, by qualification in a foreign court, so exclusive a control over the foreign assets is vested in the foreign jurisdiction, that our own courts cannot compel a settlement of the account of such assets, and payment of the balance due, although both the executor and the assets are brought within our jurisdiction?
Let us look into this question, first upon the ground of reason and convenience, and then upon authority.
Eirst, as to the reason of the thing. The argument against our j urisdiction is, that the foreign assets received under a foreign administration; must be administered according to the foreign law: that the executor is bound so to administer them; and if he is held accountable here as well as there, there may be a conflict *28 between the two jurisdictions which would be mischievous to him. The premises do not justify the conelusion. Grant that the foreign assets, though brought here, are to be administered according to foreign law; this does not prove that our courts cannot take cognizance of the case. It only proves that in deciding it, •we must be governed by the law of the country where administration was granted. That we must be so governed, I have no question. Where the sovereignty having jurisdiction over person and property has exercised its powers and committed the goods of a decedent to the executor, and bound him to account for them according to its laws, every other sovereignty is, under the sacred obligations of justice, to respect that lawful exercise of authority. It is not true, in this sense, that “a grant of administration in a foreign court is not taken notice of in our courts of justice.” Toll. Law Ex’ors 108. That doctrine is to be understood, as merely affirming that our courts admit not the authority of a foreign administrator to recover the assets within our own jurisdiction. They must respect the .grant of administration in a foreign state, in so far as relates to the assets within its power. This is the effect •of the case of Jauncey v. Sealey, 1 Vern. 397. There an English administrator filed a bill for discovery of assets against a Neapolitan administrator; there were no assets in England; the foreign administrator pleaded in bar of the discovery, that there was no estate but at Naples, and the plea was alloyred: the court thus recognizing the foreign grant of administration as it respected the foreign assets.
But though it be admitted, that the courts of this country must respect the grant of administration abroad, so far as to govern themselves by the tlaw of the foreign jurisdiction in the administration of- the assets, the question remains, whether they can take •cognizance of the case? It is objected, that it may *29 he difficult to ascertain the law of the foreign state. How, it is asked, (2 Mass. Rep. 887,) shall we tain the laws of Indostan in relation to administrations, when one has died and left assets there? I answer, precisely as you would ascertain it if a contract were made there. Thus, the laws of China have keen ascertained in English courts, in relation to the rate of interest. And nothing is more common than the obligation of looking into the laws of other countries, for the purpose of settling controversies arising on contracts made there, or titles to real estate within their sovereignty. Thus, in the case of Long v. Colston, Gilm. 98, the law of England as to the mode of transferring the rights of a feme covert in an English estate, came directly in question; and so, in numerous other cases, foreign laws respecting trade have become the subjects of inquiry and adjudication in our courts. Livingston v. Maryland Ins. Co., 6 Cranch 274; Church v. Hubbart, 2 Cranch 236. It is unnecessary to multiply authorities upon this point.
Admit the right to sue, and there can he no question of the power and the duty of our courts, in a suit against a foreign executor, who has administered' abroad and comes into this country, to inquire into and to respect the law of the foreign country in relation to the administration of the foreign assets. Whatever of difficulty or inconvenience may he fancied to exist in the execution of this duty, it weighs little in the balance, in comparison with the burdén which would he imposed upon creditors and distributees, by refusing cognizance of their cases here, though the person and the property are both in our power, and sending them to sue in a foreign country from which the executor has absconded, with the whole of the assets in his pocket. How shall they sue him there, when he is not within the jurisdiction? How shall they reach the assets there, when he has eloigned *30 them? Will it be said his sureties may be sued? J it, if he has any: when they discharge the demand, and become creditors, where shall they sue? Upon the principles assumed, they could not sue him here, and thus would be utterly without remedy: To such consequences are we led by the unnecessary adoption of the principle, that an absconding executor who has eloigned or wasted his testator’s estate, can only be sued in the jurisdiction where he proved the will. If this be so, an executor who takes probat in the District of Columbia, has only to reduce the assets into money and remove with them into Virginia or Maryland, and he is safe from all further pursuit. I cannot think so. If he comes here from a foreign jurisdiction, bringing with him the assets, or having wasted them, he ought, upon every principle of justice and convenience, to be made amenable to our jurisdiction, and compelled to account with creditors, legatees and distributees, for the foreign assets which he holds or has converted.
It is said, indeed, that peradventure there might be a conflict between the decisions of the foreign court and ours, and that between the two the executor might suffer. I think not. While this court would be bound in its decision to conform to the law of the forum which granted administration, the foreign court, on its part, would consider the party protected for what he is compelled to do by us. Ho court, it must be presumed, could ever charge an executor with a devastavit, because he has paid a debt decreed in invitum for a foreign tribunal, although the domestic forum may consider the decree erroneous. This appears to be admitted in the case of Davis v. Estey, 8 Pick. R. 475, cited for the appellee, and is abundantly supported by the most respectable authorities. Thus, in a contest between an attaching creditor abroad and the assignees of a bankrupt in England (whose rights, according to the *31 English, doctrine, cover all his property wherever found) it is declared, that if the former has obtained a judgment, however incorrectly upon principle, that judgment shall protect him. Story’s Conf. of Laws 345. And to this effect is the elaborate opinion of Lord Loughborough in Sill v. Worswick, 1 H. Blacks. 693. But if the creditor, who recovers effects to which the assignees are entitled, will be protected, a fortiori will the protection be extended to him, who has been compelled to pay to that creditor the funds to which another has a better title. Accordingly, we find the principle distinctly laid down by Chancellor Kent in Holmes v. Remsen, 4 Johns. Ch. Rep. 460, 467, 468. In that case, a debt had been paid in England to the assignees of Mullett, a bankrupt, under a judgment of the Lord Mayor’s Court of London; previous thereto, trustees for the creditors of Mullett had been appointed under the laws of Yew York, who thereby became entitled to his whole estate; and they brought suit in Yew York against the executors of Mullett’s debtoi’, who had paid the debt in London. “The question now is,” said Chancellor Kent, “whether the recovery of the debt is not a conclusive bar to the claim set up by the bill? In my opinion, the question cannot admit of a moment’s-doubt”—“If money be duly attached in the hands of a party, and he has paid it .pursuant to the judgment of a competent foreign court, I am to presume omnia rite acta: and it may be laid down as a clear principle of justice, that a person compelled by a competent jurisdiction to pay a debt once, shall not be compelled to pay it over again”—“Which of the parties would have the better title to the debt, if it were still unpaid, may be one question: but, certainly, when the title of the assignees and the trustees is equally valid under the laws of their respective countries, the debt is well paid to the party that uses the best diligence and first recovers it.” It *32 would seem, then, that there would he no danger to the executor, even if our tribunals did not admit that the assets under a foreign administration must be adminjstered according to the law of that forum by which administration was granted. But when we on our part defer to English law, and the English courts .defer to our judgments, it is impossible he should suffer.
Upon the whole, then, it appears, that in subjecting the executor to suit who has brought the assets into-this jurisdiction, no mischief will arise; while the contrary doctrine will protect an executor (who quits the country where he administered and comes over to this country with the assets) from all claim whatsoever. If he cannot be sued here, he can be sued nowhere; since the foreign court can have no longer power over him when his person and his effects are both beyond its reach. The reason of the thing, then,, is clearly with the right to sue.
How is it on authority? It is admitted, without qualification, that a foreign administrator has no right to sue. And it seems to be supposed, that the exemption from liability to suit is the correlative of this proposition. By no means. Our courts do not, indeed, recognize the right of the foreign administrator to withdraw the assets from this jurisdiction. It is clear, that as a matter of right, the power of a foreign jurisdiction does not extend over the assets which are beyond it, and that, of course, a grant of administration by it, cannot give a right or title to the administrator over assets beyond the territory of the government which grants it. Moreover, as a matter of policy and of duty to our own citizens, the withdi’awal of the assets should not be permitted, to the prejudice of creditors in our own country; who might thereby be compelled to seek their remedy in the domicil of the foreign executor, and there perhaps meet with obstructions and inequalities in the enforcement of their rights- *33 from the peculiarities of the local laws. Story’s Conf. of Laws, p. 421, 422. But these considerations no hearings against the suability of the executor. So far from it, they, would demand, that the foreign executor who comes here with the assets should be held , liable to the action of creditors for their debts, or of legatees for what is due them. If it is the duty of every sovereignty to provide for the security of its own people, it is as much bound to enforce justice in their behalf from an executor who is within its jurisdiction, and has also within it the assets out of which they have a right to payment, as it is to prevent a foreign administrator from recovering and withdrawing the assets which are within its power. It is obvious, therefore, that so far from the power to sue and the liability to be sued being correlative, they are rather antagonizing; as the same reasons which forbid first, very strongly sustain the last. Hence, it becomes unnecessary to examine any of the adjudications, except those which are supposed to deny the suability of a foreign executor. Of these there is not one, I conceive, which establishes the proposition.
In his treatise on the conflict of laws, after laying down (in page 422) in the strongest terms that “no suit can be brought by or against any foreign executor or administrator in the courts of this country in virtue of his foreign letters testamentary or of administration,” Justice Story, in a subsequent passage (page 431) states, less broadly, that “there are authorities which indicate, that a foreign executor is not liable to be sued here as such.” Let us then see what are these authorities which are referred to by this learned jurist, whose research leaves no room to doubt, that he has collected all the cases which bear upon the question.
•The first of the cases referred to is that of Selectmen of Boston v. Boylston, 2 Mass. R. 384, which certainly establishes no such proposition as is contended for. *34 To say nothing of the fact that it was the case of an administrator, whose sole power is derived from the court of probat, instead of that of an executor, whose powers are derived from the will, it is sufficient to observe, that the case was expressly decided upon a particular statute of Massachusetts, which provides for the grant of administration (in the case of a will that has been proved in a foreign state) “of the testator’s estate lying in that state, and for the settlement of the said estate.” How, the proceeding there was not a suit against the administrator, either at law or in equity, but a citation, calling upon him to settle his accounts; and the court decided, that as a court of probat under that statute (whose powers are more limited than those ' of a Court of Chancery, 1 Mason 420) it had authority only to settle the account of the estate lying within that commonwealth. This was as obviously right as it was clearly no decision of the question before us. It by no means proves, that the plaintiff’s demand (which, as in our case, w7as for a legacy, in relation to which the laws of the two countries are in unison) could not have been enforced in a Court of Equity, or that a creditor by specialty could not have sued and recovered at law, unless the defendant could have shewn a full administration, or debts of superior dignity according to the English law.
The next case referred to by Judge Story, is that of Goodwin v. Jones, 3 Mass. R. 514, but as the question there was as to the power of an administrator to sue, and not as to his suability, it cannot bear upon the question here.
The next case is Davis v. Estey, 8 Pick. R. 475. That case was a debt on a note against an administrator who first qualified in Vermont, where the assets -were more than exhausted by Vermont creditors. He afterwards qualified in Massachusetts, and was sued there. The Massachusetts assets were sufficient to *35 pay the plaintiff; hut he only claimed to he entitled to a pro rata dividend out of the whole property in both states; and so the court decided. I am at a loss to perceive what influence this case can have upon the question before us; for it is plain, that as the foreign assets were insolvent, no question could arise as to the power to reach them; and as to the administrator, there could be no question as to his suability in respect of the Massachusetts assets, he having qualified in that state as well as in Vermont.
The case of Dawes v. Head, 3 Pick. R. 128, 143, was determined, avowedly, without touching the questions in relation to the administration of foreign assets, which are pronounced to be of a novel and delicate nature. The case however is very much like that of Davis v. Estey, and is liable to the same remarks.
Lastly, in Doolittle v. Lewis, 7 Johns. Ch. Rep. 45, 47, though Chancellor Kent states, broadly, that a foreign executor cannot sue or defend, yet the remark was altogether extrajudicial; and the same may very truly be said of the case of Morrell v. Dickey, 1 Johns. Ch. Rep. 153, to which-the learned judge refers. It is observable too, that in this last case there is no intimation that a foreign executor cannot be sued.
Besides the foregoing cases, which are all that are cited by Judge Story in the passage last referre.d to, there are a few others which it may be proper to notice. Thus, in the case of Richards v. Dutch, 8 Mass. R. 506, it was decided, that “ legatees, who claim only from the bounty of the testator, must resort to the country of the testator, where the will was proved originally, and by the laws of which his effects are to be distributed, to obtain the bounty they claim;” and the same doctrine seems to have prevailed in Dawes v. Boylston, 9 Mass. R. 337. These decisions appear to me unreasonable and extravagant, and they are rejected by Judge Story himself in the case of Harvey v. Richards, *36 1 Mason 381, 420, 421. They are opposed, too, by the decisions in other states (Guier v. O’Daniel, 1 Binn. 349, in note) and by the English cases collected by the court in Harvey v. Richards. It would be unreasonable, indeed, that a legatee should be compelled tugo abroad to get payment out of assets that are here,. in the hands of an administrator who has duly qualified in our courts, and is within our jurisdiction.
In Jauncey v. Sealey, 1 Vern. 397, the plaintiff as administrator of J. S. who died at Naples, brought his bill for a discovery of the intestate’s personal estate, against the executor who qualified in Naples, but was then in England. There were no assets except assets' in Naples, and it does not appear that they were brought over to England. The plea of these matters was held a bar to the discovery. Scrimshire v. Scrimshire, 2 Hagg. 420 (as cited, Conf. of Laws 482), is to the same effect. Those cases, I presume, were rightly-decided : 1. Because the plaintiff claiming the discovery, was neither creditor nor legatee nor distributee; He was the home administrator, seeking an account of assets in another country, from the foreign administrator then in England. What right had he to demand those assets,, which had been lawfully committed-to the foreign administrator by the jurisdiction within whose power the assets had been, and still continued? That administrator, according to my view of the subject, might have been liable to the action of creditors and legatees, since as administrator he was bound to' pay the debts and legacies all over the world, but he was in no wise bound to pass over the foreign assets to another representative of the estate, for the purpose of being administered by him. 1 Mason 423. 2ndly. Because the assets were neapolitan assets, and were still within the power of that forum which had granted' .the administration. To have decreed that the foreign-executor, then in. England,, should deliver over to an. *37 English, administrator the goods which were in Naples, would have been to require what might have been impossible, and was contrary to his duty; and if the delivery could not be decreed, the plaintiff could derive nobenefitfrom, nor have any title to, a discovery.
The last case I shall advert to, is Newby’s adm’r v. Moore’s ex’ors, 1 Dowl. & Ry. 35, 16 Eng. C. L. R. 15. The testator’s widow, who administered in India, remitted the effects to an agent in England. A creditor administered in England, and as administrator brought assumpsit against the agent of the administratrix, for the money in his hands. The court held, that the foreign administratrix was entitled to all the assets which the testator left in India, and that the English administrator could not recover them from the agent. This case, then, concurs with the preceding, and the remarks already made as to them, fully apply to it.
Upon a full review of the whole subject, I am of opinion, that justice, convenience and necessity requii'e a recognition of the right to sue an executor who has qualified abroad, if he comes within this jurisdiction bringing the assets with him; and no authority sustains the contrary proposition. "Whether he would bo liable to suit here, if the assets still remained abroad, •it is not necessary in this case to determine.
I have occupied so much time on this novel and important topic, that I must content myself with a very succinct notice of some others. The next point of importance refers to the dignity of this debt. And here it is to be observed, that this inquiry depends upon Virginia statues, not upon English law. Benjamin Pollard the elder was indebted to the estate of Oamm G-arlick, and upon his death Benjamin Pollard the younger administered on his estate, and became liable to pay his debts according to the dignity prescribed by the Virginia law. If then, by our law, the debt due from the estate of Pollard the executor to *38 the estate of Camm G-arlick his testator, was a debt entitled to preference, it can be of no importance whether it would be so regarded by English law or not.
By the act of 1705, ch. 33, § 13, it is very clear, that the debt of an executor to his testator’s estate is of the first dignity, though he has never qualified. We do not consider that act as repealed by any subsequent act, until it was repealed by the provision of' the act of March, 1819, “ providing for the republication of the laws,” 1 Rev. Code, ch. 1, § 9, p. 16. We all consider the acts of 1748, ch. 4, § 13; of 1785, ch.. 61, § 50, and the revised act of 1792, as cumulative; and instead of designing to narrow the provision which gave preference to the payment of these demands against fiduciaries, they were intended to extend it, and to embrace cases not within the act of' 1705; such as the cases of committees of lunatics,, sheriffs committees of intestates’ estates, and the curators of the property of deceased persons, &c. With this view of the matter, we are of opinion, that this was a debt of the highest dignity.
But we think the payments of the two judgments of Reames and Coker by Pollard the administrator, were payments in his own wrong. There is no doubt that those judgments, which were of very ancient date, were fully within the operation of the statute 1 Rev. Code, ch. 128, § 17, by which not only was all remedy upon them against the administrator barred by the lapse of five years from his qualification without any proceedings had upon them, but it is provided that they “shall be deemed” (that is, taken, held, considered) “ to have been paid and discharged.” This-provision is much stronger than any clause of the-English statute of limitations, and seems to me to make it the duty of executors to plead the statute. It has, indeed, been repeatedly observed in England, *39 that an executor is not bound to plead the statute there. But this doctrine seems of late to have been seriously and very properly shaken, at least in the extent to which it had been carried. Thus, in M’ Culloch v. Dawes, 9 Dowl. & Ryl. 40; 22 Eng. C. L. R. 385, where the testator had incurred a debt in 1796 and died in 1804, and suit was brought in 1826, Bayley, J. observed, that “ executors are bound, if possible, to resist such a claim: they have no right to waive any legal defence to such an action; and if they did, and were to pay a debt against the recovery of which there was any legal bar, they would render themselves liable over to those who were interested in the testator’s property.” This, though an obiter dictum, is the dictum of a most distinguished judge, and is entitled to the more consideration, as all the opinions on the other side are founded on an incidental remark of Lord Hardwick in Norton v. Frecker, 1 Atk. 526. In a late ease, too, in equity, it has been decided by Lord Brougham, that when a suit in equity is brought convening the executor and all the creditors of the estate for the purpose of distribution and administration of the assets, in the master’s office, any party interested, whether creditor, executor or volunteer, may insist upon the objection. Shewen v. Vanderhorst, 1 Russ. & Myl. 347; 4 Cond. Eng. Ch. R. 458. In New York too, it has been decided that an executor cannot be allowed in his accounts a charge for retaining a debt barred by the statute at the testator’s death, on the ground that it is no longer a debt. Rogers v. Rogers, 3 Wend. 503. Mathews on Ex’ors 137, lays down the doctrine also as it was decided by Lord Brougham, though he quotes Burke v. Jones, 2 Ves. & Beam. 275. These cases shew, that it is by no means a settled rule elsewhere, that an executor may of his own will, and against the interest or express direction of the parties interested, saddle *40 the estate with a debt which he might successfully have resisted. Still less can such a principle prevail in relation to cases within the 17th section of our statute of limitations, which declares that every judgment against a testator, upon which no proceedings shall have been had within five years from the executor’s qualification, shall be “ deemed to have been paid and discharged.” Under this clause, I incline to think an executor is always bound to make this defence, unless it be waived by those who are interested; but be that as it may, I am satisfied, that there may be cases in which it would be his duty; and in the case under consideration I do not think he had a right, while the plaintiffs were in full pursuit of their demands, to take away from them the advantage they had acquired. The 'debts which had precedence of theirs were now barred by the statute, and “ deemed to have been paid and discharged;” and it was a violation of their rights, to give new life and vigour and precedence to demands, which, but for the collusion of the administrator, could no longer be a barrier to their recovery. Bor I presume, that to the plea of debts of superior dignity, the creditor plaintiff may well reply that those' debts are barred by the statute and deemed to be.satisfied and paid.
In this view of the case, it is unnecessary to inquire into the alleged fraud and collusion in the payment of these judgments, the circumstances of which, to say the least, are very suspicious. Uor is it necessary to examine the other questions in the cause. It remains but to observe, that in reversing the decree, the cause must go back for further proceedings, since it does not appear whether any and what payments have been made by the representatives of John and Samuel Gfarlick. This inquiry must be made in the court below.
Cabell aud Brooke, J. concurred. It was under *41 ■stood that Parker, J. dissented, hut his ill state of health prevented him from giving the reasons of Opinion. r '
The decree entered in the Court of Appeals was as follows:
“ The court is of opinion that Benjamin Pollard the executor of Camm G-arliclc, deceased, and who quali■fied as such in the Prerogative Court in England, was properly amenable to the process of the courts of this commonwealth, at the suit of those interested in the .estate, he having removed hither with the foreign assets, which, as it appears, he afterwards wasted and eloigned. And the court is further of opinion that the payments made by Benjamin Pollard, administrador of Benjamin Pollard, deceased, executor as aforesaid, of the two judgments of Kearnes and Coker, were improperly allowed to the said administrator in the settlement of the administration account, as against the plaintiffs’ claim: that the debt of Camm Garlick’s •executor, Benjamin Pollard, to the estate of the said Garlick, was a debt of superior dignity to the said judgments; but that if it were not so originally, it ought not now to yield to them, as they were barred by lapse of time, and by the provisions of the statute are presumed to have been paid and satisfied: that they ought therefore to have been resisted by the administrator, and might have been successfully resisted by relying on the seventeenth section of the statute of limitations: that the plaintiffs, as creditors, had a right to insist on the objection of the statute against those judgments (15 Ves. 498) and that the administrator was bound to make it under the circumstances of this •case, instead of making payment to the prejudice of creditors whose demand was in a full course of prosecution and was not liable to the objection of the statute. The court is therefore of opinion that the decree *42 of the said Circuit Superior Court is erroneous in dismissing the bill of the appellants. Therefore ”
Decree reversed with costs, and cause remanded to the Circuit Court, to be einally proceeded in PURSUANT TO THE PRINCIPLES OE THE EOREGOING OPINION AND DECREE.*

 It was alleged by the administrator Pollard, in his answer, that his intestate took the benefit of the laws for the relief insolvent debtors, and was discharged from custody, at the suit of Ooker, in 1804; but no evidence of such proceeding was exhibited, and the fact nowise appeared by the record, that he was discharged as an insolvent. If evidence of such a proceeding had been adduced, it would have been a question of very different consideration, whether the 17th section of the statute of limitations would have been a bar to the action of Coker against the administrator of Pollard, upon his judgment against the intestate in his lifetime? But the point was not considered by the court, or made at the bar, probably because it was thought that it was not presented by the record. If the intestate Pollard took the benefit of the laws of Virginia for the relief of insolvents, in a state court, and was discharged from custody at the suit of Coker, the laws of Virginia vested all the estate of the insolvent debtor, for such interest as he had therein and might lawfully depart withal, in the sheriff for the benefit of the creditor at whose suit he was in custody; and the creditor might, at any time after-wards, have sued out a scire facias to have execution against any estate the insolvent debtor thereafter acquired or was possessed of. 1 Eev. Code of 1792, ch. 151, $ 39-42, Pleas. Edi. p. 303; 1 Eev. Code of 1819, ch. 134, $ 31, 2, 3, 4, 5, p. 536-8. If he took the benefit of the laws of the United States for the relief of insolvents, in a Eederal court (and if there was any such proceeding, it probably occurred there), the act of Congress of January 6, 1800, 3 Bior. 301, provides, that any person imprisoned on 'process of execution, issuing from any court of the United States, in civil actions, may take the oath of insolvency thereby prescribed; and, thereupon, “the debtor shall be discharged from his imprisonment on such judgment, and shall not be liable to be imprisoned again for the said debt, but the-judgment shall remain good and sufficient in law, and may bo satisfied out of any estate which may then, or at any time afteripqrcls^ belong to the debtor.”