CASE No. 865.

CURETON v. MILLS.

1. Where the administrators, in this state, of an intestate, whose domicil was here, also administered in North Carolina, and brought personal property

there found into this state and sold it, they must account here for the proceeds of such sale.

2. The rights and liabilities of original and ancillary administrators, and their relation to each other, in such case, determined, and cases reviewed.

3. Such assets must be accounted for and distributed in this state, as it regards North Carolina debts, according to the laws of the state of North Carolina.

4. An aggregate of expenditure for a calendar year will not be allowed administrators on their accounts, in the absence of evidence showing that the items were proper credits.

5. This court will not notice a ground of appeal based upon a confirmation by the Circuit decree of the referee's report in a particular to which no exception had been taken.

Before PRESSLEY, J., Spartanburg, June, 1879.

This was a bill filed in the court of equity for Spartanburg county, in May, 1868, by Thomas K. Cureton and Nancy R. Mills, as administrators of Govan Mills, and Mary S. Cureton against R. H. Mills, J. C. Mills, J. B. Davis and William Ballenger, for a settlement of the estate of Govan Mills, who died intestate in 1862, in South Carolina, in which state he was domiciled. The administrators here were also administrators in North Carolina. Nancy R. Mills was the widow, and R. H. Mills, J. C. Mills and M. S. Cureton were the children of intestate. Davis and Ballenger were creditors, citizens of this state. They answering demanded an accounting, and all creditors were called in to establish their demands. R. H. Mills, J. C. Mills and Nancy R. Mills died before the hearing in the Circuit Court.

Govan Mills owned lands and personal property in both North Carolina and South Carolina. Negroes and other personalty were appraised on the North Carolina plantation, under the order of the Ordinary of Spartanburg district, by South Carolina appraisers. This property was then brought into this state and sold.

F. M. Trimmier, Esq., clerk of court, to whom it was referred as referee to state the accounts, found, as a matter of fact, that there were creditors in both states; that the administrators had not kept separate accounts of their two administrations; that they had sold in this state personal property brought here from North

Carolina to the amount of $20,803.28. As a matter of law, the referee gave the administrators credit for this sum, as not chargeable against them in this state ; and refused them credit for payments made to creditors residing in North Carolina. In the statement accompanying his report, no credit was allowed the administrators for two items, proven by the attorney for the administrators in words following :

Since the last return, to wit, in 1871, the administrators received $253, and amounts paid out $325. Also, from 1862 to 1866 the administrator paid to witness, as attorney's fees and for collections and expenses, $1217.25 in confederate money.

To the report of the referee the plaintiff filed the following exceptions :

3. Because the referee, in the accounting, failed to allow a credit of $325, paid out in 1871.

5. For that referee reported that none of the payments of claims belonging to residents of North Carolina are proper credits in the accounting here of the administrators.

6. For that referee failed to report that the estate in South Carolina had been fully administered.

And the creditors of the estate filed the following exceptions to this report :

1. That the referee allowed the administrators credit for the sum of $20,803.28, the amount of sales of personal property sold in South Carolina under the order of the Court of Ordinary for Spartanburg county, South Carolina, as assets belonging to the administration in North Carolina.

2. That the referee failed to charge the administrators with the surplus of the estate after administration in North Carolina.

The Circuit decree is as follows :

The domicil of the intestate, Govan Mills, was in this state, but he owned property also in North Carolina, and plaintiffs are his administrators in both states.

Some of his slaves, which, at the time of his death, were on his plantation in North Carolina, were brought by plaintiffs into this state, where they were appraised and sold by order of the Ordinary of Spartanburg in 1862. From that time until this suit, the assets of intestate in both states were administered in the

payment of debts, without regard to the residence of the creditors; some debts in each state remain unpaid and the assets are insufficient to pay all.

Plaintiffs now claim that the proceeds of the slaves which were in North Carolina when intestate died, should be omitted from the account in this state, and the referee sustains that claim. He also refuses to allow plaintiffs credit on their accounts here for their payments to creditors residing in North Carolina.

To these and other rulings of the referee both sides have filed exceptions which I will not notice in detail, because I prefer to re-commit the case for further inquiry and report according to the following rulings, to wit:

1. I hold that the proceeds of said slaves are assets in this state, it being the domicil of the intestate, and the property having been appraised and sold here by legal authority. *Collins* v. *Bankhead*, 1 *Strob.* 25; *Wilkins* v. *Ellett*, 9 *Wall.* 740.

2. That this estate being insolvent, all its assets in both states are to be applied so as to equalize all the creditors according to their legal priorities, but with due regard to the priority law of each state as to the assets within its limits. *Dawes* v. *Head*, 3 *Pick.* 128; *Tucker* v. *Condy*, 10 *Rich. Eq.* 12.

3. That the payments to North Carolina creditors are to be charged to the assets in that state, and if the same be insufficient to equalize the creditors there with those in this state, they are to be made equal out of the assets here, and a like equalization is to be sought in North Carolina by creditors residing in this state if the assets here are not sufficient for that purpose.

4. In taking the accounts of defendants, all confederate money received and not heretofore paid out by them, is to be reduced to its value according to our statute.

It is ordered and adjudged that the rulings above-stated stand as my judgment and decree, that the case be re-committed to referee to take and report a full account of the assets and debts in each state, and what amounts are yet due in each by the defendants and to what debts, according to priority, the balance in this state, if any, should be applied; that he also report what amount, if any, of the assets in this state, should be paid to creditors, and what creditors, in North Carolina, in order to equalize

them according to the rank of their debts with like creditors in this state.

From this decree T. K. Cureton appealed to this court.

*Mr. J. S. R. Thomson,* for appellant.

Appeal lies—*Code,* § 11 ; 15 *Stat.* 495 ; *Voorh. Code,* 349 ; 4 *S. C.* 115. The case in 8 *S. C.* 112, is not in point. Credits should have been allowed for the $325.90, and the $1217.15 ; they were doubtless oversights. The proceeds of the sale of the personal property brought from North Carolina are not properly chargeable in the account of the administrators in this state. The Circuit judge errs in saying it was appraised in this state. 7 *S. C.* 63 ; 1 *Rich.* 116 ; 5 *Ired. Eq.* 367 ; 2 *Bail.* 438 ; *Story on Confl. Laws,* §§ 513–518, 529 *b, c, d ;* 3 *Redf. on Wills* 27 ; *Freem. on Void Jud. Sales,* § 4 ; 2 *Wms. on Ex'rs* 982 ; 14 *Rich. Eq.* 105 ; 16 *Wall.* 610 ; 15 *Pet.* 6 ; 6 *How.* 59 ; *Pend.* v. *Cooke,* (*Conn.* 1877,) 6 *Reporter* 518 ; *Rorer on Inter-State Laws* 251. Payments to the North Carolina creditors are proper credits in the appellant's administration account here. 11 *N. H.* 95 ; 45 *Iowa* 221 ; 2 *Kent* 434 ; 10 *Rich. Eq.* 16 ; 44 *Texas* 497 ; 3 *Pick.* 128 ; 4 *McC.* 28.

*Mr. J. B. Cleveland,* contra.

The order is not appealable. *Dud. Eq.* 24 ; 8 *S. C.* 112. To the authorities cited by the Circuit judge to sustain his propositions, we add the following: 2 *Bail.* 436 ; 5 *Pet.* 518 ; 45 *Iowa* 221 ; 3 *Pick.* 128 ; 1 *Strob.* 25 ; 1 *Rich.* 116 ; 10 *Rich. Eq.* 12 ; 9 *Wall.* 740 ; 7 *S. C.* 60 ; 4 *McC.* 28 ; 4 *McC.* 278 ; 1 *Mills' Const. R.* 292 ; 5 *Cranch* 289.

April 24th, 1880. The opinion of the court was delivered by

WILLARD, C. J. This case involves the accounting of the administrators of G. Mills. The leading question arises out of the following facts : G. Mills was domiciled, at his death, in this state, and died intestate, leaving property and debts in both this state and North Carolina. T. K. Cureton and N. Mills took out letters of administration in both states. Personal property of the intestate, situated in North Carolina at his death, was reduced to possession there by the administrators and brought

into this state and sold by order of the Ordinary of Spartanburg. There appear to be debts of the intestate due to citizens of both states unsatisfied, and it is claimed that as it regards North Carolina debts the North Carolina assets should. be applied by the administrators in accordance with the laws of that state, and not according to the priorities existing under the laws of this state. The only appellant here is the administrator, T. K. Cureton. His principal objection to this Circuit decree is that it decreed that the proceeds of sales of slaves brought from North Carolina and sold here are, chargeable to the administrator's account here, and that it directed the application of the North Carolina assets, instead of holding, "that the whole of the North Carolina property should be accounted for there, and this plaintiff chargeable here as to North Carolina assets only with any surplus that might be found in his hands after a full accounting had and decree made in North Carolina."

.The proposition embodied in the appellant's objection, just stated, is that the administrator ought not to be held to account for so much of the, assets as came from the sale of the property of the intestate situated in North Carolina, at his death, and brought within this state by the administrators, but, if accountable therefor, under any circumstances it would only be after the North Carolina debts had been paid, and then only as it regarded the surplus of the North Carolina estate remaining undisposed of after the payment of the debts there due.

It will be observed that no North Carolina creditor is before this court as an appellant, and we are at liberty to infer from the record before us that no such creditor appeared in the action or was represented otherwise than by the administrators, one of whom is appellant here. The objection comes wholly from the administrator himself. The objection that would exclude the authority of the courts of this state from control over assets subjected to the authority of the Ordinary of Spartanburg, by the voluntary act of the administrators themselves, would seem, in itself, anomalous; but the question will be considered and disposed of on more general grounds. The questions then to be considered are, *first*: Have the courts of this state jurisdiction to compel a domestic administrator, representing an intestate, dom-

iciled at his death in this state, to account for assets of such intestate held in this state, and received by such administrator under letters of administration issued to him by a foreign state, when such assets were situated in such foreign state at the death of the intestate, and were of a personal character? And, *second*, if such assets may be distributed by such domestic jurisdiction, must they be so distributed according to the laws of the state where they were so situated at the death of the intestate, or according to the laws of the domicil of the intestate?

In considering the first in order of these questions, it is material to notice the circumstance that the same persons were administrators in both states. This fact renders it necessary to consider the question of jurisdiction under two aspects. Suppose that the plaintiffs had been administrators in this state alone, and other persons had administered in North Carolina, and had collected the assets there situated, and had turned over such assets into the hands of the plaintiffs as the administrators of the domicil of the intestate for administration here? Could the courts of this state have assumed control over such assets in a proceeding in this state to compel the domestic administrator to account? This constitutes one of the two aspects above-noticed. The other may be illustrated by supposing that the present plaintiffs were North Carolina administrators alone, and not entitled to represent the intestate's estate in this state, would they, being citizens of this state, found here, and having had North Carolina assets, brought here by them, be held accountable here for the administration of such North Carolina assets?

Looking at the question under immediate consideration in the first of these aspects, it assumes the following form : Can the administrator of the domicil of the intestate be compelled to account for assets of his intestate found in his hands in such state, notwithstanding such assets may have been situated at the death of decedent in a foreign state, and there reduced to possession under administration granted by such state? The principles from which the solution of this question would naturally flow are well established by abundant authority, and free from dispute. All the authorities concur in the conclusion that according to the principles of international law, universally

adopted, the administration had, at the domicil of the decedent, whether dying testate or intestate, is to be regarded as the principal administration, to which all foreign administrations, granted by reason of personal assets being found at the death of the decedent in a state foreign to that of the domicil, are, in some sense, a degree subordinate. The exact relations subsisting between this original and the ancillary administrations are differently estimated by different states, but all recognize some degree of subservience on the part of the ancillary administration to the administration of the domicil. For instance, all agree that where the purposes of the ancillary administration are accomplished, according to the law of such ancillary administration, and a residuum remains, that such residuum is subject to the purposes of the original administration, to be distributed according to the law of the domicil of the decedent. There is a difference of opinion as to whether that residuum should be transmitted to the domicil of the decedent for distribution, notwithstanding there may be legatees or distributees residents of the state of such ancillary administration; some authorities holding that opinion, and others sustaining the view that when the legatees or distributees reside within the place of the ancillary administration that distribution may be made by the court of such state of assets under their control, though following the law of the domicil as it regards the order of that distribution. *Harvey* v. *Richards*, 1 *Mason* 381.

It will not be necessary for our immediate purpose to attempt to state the doctrine that appears to be supported by the best reasons and authority as it regards the authority of the courts of the place of the ancillary administration over assets found at the death of the decedent in such place, for, as has been already said, the validity of this principle, to which the solution of the present question is to be referred, is not involved in such discussion, but stands conceded by all.

It is one of the necessary deductions from the general character ascribed to this administration at the domicil of the decedent, by the authorities, that such administration is, in its nature, general and unlimited, while the ancillary administration is both special and limited. The nature of the administration had at

the domicil of the decedent depends on the universally received doctrine that personal property follows the person of its owner. This principle, doubtless, had its origin in the enlarged spirit that flows from commercial intercourse among nations. It may well be conceived that there was an older notion, more agreeable to the conceptions of states living in isolation, and, therefore, jealous of their authority, by which property, either personal or real, within such state, claimed by a citizen of a foreign state, could only be controlled and disposed of in such manner as would be admissible if the foreign owner were present and subject to the laws prevailing where such authority was to be exercised. With the development of international commerce would arise a necessity that movable property, the special subject of that commerce, should, wherever located, be immediately under the control of its owner, to the end that its transmission may be facilitated, as it would be where the owner, in its disposition, was compelled only to consult the law to which he was personably amenable, and not bound to act as a subject, *sub modo*, of every state where his property chanced to be located for the time being. Immovable property, such as lands and houses, not being within the sphere of the general operations of commerce, would remain under the more primitive rule, and that is its condition at the present day. The fact that the rule that personal property follows the person of the owner in the sense that the law that binds the person is the law that governs the transmission of his personal effects has been universally ascribed to the international law and not to municipal regulations, seems to justify the conclusions just drawn as to its origin and the nature of the rule antecedent to it. It will not be necessary to add that the force of this rule of international law depends upon local acceptance, and that many exceptions to its universality are recognized by all states; indeed, it is competent for any state to deny the rule altogether and transfer the interchange of personal property by applying the rules commonly confined to immovable property alone.

This rule of the international law looks to the power of control over movables as the essential feature of the idea of property, and to the subject of property as the adjunct, and localizes such property for the purpose of disposition where the dispensing

2 D

will may be found. It would follow that according to this idea the authority of the owner of movable property must be regarded as in its nature general and unlimited ; general, because it covers all his movables, under whatever local sovereignty they may chance to be placed, and, unlimited, because he is not constrained as it regards the objects in regard to which he may exercise that power of control or disposition. In saying that the power of the owner over his goods is general and unlimited in its nature, it is not affirmed that that power is necessarily absolute, or, in its exercise, free from limitations imposed by the various sovereignties where his property of that class is situated, for that is not true of his domicil and cannot be absolutely true of any other jurisdiction within which his movables may be situated. Such limitations, in the exercise of the rights of ownership, do not result from the operation of any such principle as that the owner of property can only exercise such authority as is permitted by the laws but from a conflict beteen the rights of the individual and the community, in which case the former must give way.

Such being the character ascribed by our laws to the authority of the owner of chattels, whatever may be their *situs*, it would seem to follow that when that authority comes to be represented in the hands of a personal representative of a deceased owner it would possess the same nature, although that authority cannot exist to the same extent as it did in the owner while living, for the reason that the personal representative is bound either by the testamentary disposition of his testator or by the law of distribution, which did not bind the decedent. The terms general and unlimited, as applied then to the representative of the decedent, must be taken in a sense more restricted than when applicable to the living owner. It may be said to be general in the sense that it extends to all the personal effects of the decedent wherever situated, and unlimited in the sense that all the objects contemplated by the law of testamentary disposition, or of distribution of the domicil, are competent and proper objects to be had in view in the administration of the estate.

The distinction that has been pointed out between the characters of the original and of the ancillary administration will be

better understood when the restricted character of the latter is fully presented.

The ancillary administration, we have said, is special and limited. The sense in which these terms are used is the same as that just applied to the original administration. That administration is special, because it extends merely to such personal effects of the decedent as may be found at his death in the place of ancillary administration, while, as we have seen, the scope of the original administration is commensurate with the whole personal estate of the decedent wherever situated. The ancillary administration is limited in the sense that the objects to which that administration looks do not comprehend all that are appropriate to the original administration. The ancillary administrator is primarily concerned only with the debts of the decedent at the place of ancillary administration, and with the administration of the assets only to the extent requisite to pay such debts. In some instances the courts of the ancillary administration have undertaken to distribute the estate of a foreign decedent; but this is an exceptional jurisdiction, depending upon special circumstances, such as the fact that all the distributees, legatees or creditors are residents of the state where the assets of a foreign decedent were found, and the ancillary administration personally amenable to that jurisdiction. No authority appears to sanction the idea that the ancillary administration could make distribution in favor of foreign creditors except by the aid of the decree of a court of competent jurisdiction.

Before looking into the authorities to see how far the views already expressed have their sanction, it is proper to observe that it is only in a potential sense that the original administration embraces all the effects of the decedent where part of these effects are situated in a foreign state. The laws of that state may prevent that claim from being actually asserted until the debts of the decedent then due are paid. But this is merely a limitation of a recognized general authority in the original administration, for the moment the objects of the ancillary administration are accomplished, the general right of the administrator of the domicil is respected by all foreign states, and the residuum subjected to that control, thus evincing a general

recognition of the fact that the ancilliary administration is special and limited, and the original administration general and unlimited.

The most conclusive proof that the original administrator has that general character which has been stated is the fact that all the creditors, whether domestic or foreign, are embraced within the rule of disposition that binds the original administrator. *Cameron* v. *Wurtz,* 4 *McC.* 278 ; *Dawes* v. *Head,* 3 *Pick.* 128. Some states and countries give preferences as among different classes of creditors, and in some instances preferences to their own citizens over foreign creditors, but none exclude foreign creditors from distribution, even though, by the law of the countries where they reside, the effects of the decedent, found in such countries at his death, may be subject to a preference in behalf of its own citizens who may be creditors. It is obvious that if all creditors, wherever residing, are within the scope of the original administration, that all assets, wherever situated, must equally be within that scope. It is hardly to be supposed that the one would be included and the other excluded. Indeed, where a creditor who had availed himself of the laws of New Jersey to obtain part payment through an ancillary administration in that state, applied to come in with other creditors in New York, the place of original administration, all that the court did in view of the advantage gained in New Jersey was to equalize the other creditors with the one who had obtained part payment in New Jersey, allowing him to come in on equal terms with all others as it regarded the totality of assets, foreign and domestic, deducting the amount he had received. *Lawrence* v. *Elmendorf,* 5 *Barb.* 73.

We come, now, to the authorities bearing on the question.

*Conover* v. *Chapman,* 2 *Bail.* 436. The intestate was domiciled in South Carolina. The South Carolina administrator was also administrator in Maryland, where assets of the intestate estate were situated at the death of the intestate. The administrator was sued in this state on a debt of his intestate, and pleaded "*plene administravit* of assets which had come to defendant's hands in this state." The plea was adjudged bad on demurrer, on the ground that it was to be assumed that by the laws of

Maryland, the administrator was bound, after paying debts there due, to apply the residuum to the purposes of the original administration in South Carolina, and, therefore, there was at least a conditional obligation on the part of the administrator to account for the Maryland assets. Judge Butler holds that the administrator was not indeed chargeable with the Maryland assets to such extent as to render him amenable to account in this state for the disposition made of the Maryland administration, but that he was under a more limited obligation to account therefor, and that his plea of *plene administravit* should have been general and not limited to the assets found in this state. He recognizes the principle that the South Carolina administrator and the Maryland administrator must be legally considered distinct persons as it regards the separate offices held by the same person. This case fully recognizes that the primary authority of the administrator, at the domicil of the intestate, extends to all his effects, wherever situated, although, as it regards foreign assets, he may ordinarily account for them by showing that they are subject to another jurisdiction, to which, as a general rule, he is alone responsible for their disposition. It is consistent, therefore, with the proposition that the authority of the original administrator is general and unlimited in its nature, and his liability commensurate therewith.

*Carmichael* v. *Ray*, 1 *Rich.* 116. The administrator of an intestate, domiciled in South Carolina, sought to recover, upon his title as administrator, personal property of his intestate that was situated in North Carolina at his death. It was held that the South Carolina administrator acquired no title under his letters of administration to property of the intestate beyond the territorial jurisdiction of this state. This case may seem to militate against the conclusions, to the support of which it is cited, but that is apparent merely, and not real. It is one thing to say that the scope of administration is general and extends to all assets of the intestate wherever situated, and another to say that, under the circumstances of its location, his title cannot be asserted over a particular chattel that appertained to his intestate's estate. It is obvious that the conclusion of the court was correct. The defendant claimed the property under the opera-

tion of the laws of North Carolina during the time that the property was subjected to that jurisdiction. It was clearly competent for the laws of that state, operating upon a subject of property subjected to them, to create a right of ownership that would be respected everywhere. To assert title in the administrator, under such circumstances, would be equivalent to denying to the laws of North Carolina that force which is everywhere accredited to the laws of a sovereign state over all persons and property subjected to them. Suppose, however, that the administrator in that case had obtained rightful possession of the North Carolina property, and had brought it within this state, there is nothing in the case that would preclude the idea of his being accountable therefor as proper to be applied in a due course of administration here. Indeed, Judge Butler instances, in the opinion in that case, the payment of a foreign debt to a domestic administrator, recognizing the principle that where such payment is made, the sum paid would be assets rightfully in the hands of the administrator for administration, but he correctly holds that that principle is not applicable to the case he had in hand. Unless foreign assets are within the general scope of the administration how could the administrator be chargeable with such assets coming into his hands under such circumstances?

*Wilkins* v. *Ellett*, 9 *Wall.* 740. It was held that a payment of a debt due by a citizen of one state to the administrator under the laws of another state, where the intestate was domiciled at his death, there being, at the time of such payment, no administration in the state of the debtor, was a valid payment and discharged the debt. It has been questioned whether this is not allowing the debtor to subvert the laws of his state by voluntarily contributing to remove therefrom assets, that, by those laws, are devoted to debts due within the state. However this may be, the recognition of the general nature of the authority of the administrator of the domicil involved in this case does not appear to have been at any time brought into question, and it does not appear to be questionable.

It will not be necessary to go further in the examination of the authorities, domestic and foreign, on this point, as none are found that militate against the proposition advanced, while

throughout the whole the fundamental principles on which that proposition rests are abundantly illustrated.

If the original administrator has a general right as to all effects wherever situated, his obligation is commensurate with that right and extends to accountability for all assets reduced and reducible at home, and all actually reduced abroad. It would follow that when this administrator of the domicil of the intestate holds possession of personal effects of his intestate, within the jurisdiction from which he derives his authority as administrator, he is bound to account therefor, even though such effects at the death of the intestate were situated within a foreign jurisdiction. It would also follow that the domestic administrator is bound to account for all assets reduced to possession, wherever situated at the death of the intestate, but that such assets are properly accounted for, as a general rule, when it appears that they were, at the death of the intestate, in a foreign jurisdiction, and still so remain, and that his possession thereof was obtained as administrator under the authority of such foreign state, and that the purposes of such ancillary administration have not been fulfilled. For any *devastavit* of the foreign assets in the course of the ancillary administration, he would be subject to the jurisdiction of the domicil, at least to as great an extent as an ancillary administrator would be who was not accredited as the administrator of the domicil, which liability will be hereafter considered.

We come now to the second aspect of the general question, that proceeds on the supposition that the administrator had been sued in this state solely in his character of a North Carolina administrator. Could such a suit be maintained? If a citizen of this state is appointed under the laws of another state administrator of one domiciled in this state at his death, having assets in such foreign state, and such administrator bring such assets within this state, can the parties interested as creditors or distributees, compel such foreign administrator to account for such assets here?

As a general rule, rights of property matured and perfected under the laws of a state having jurisdiction of the person and property involved, are respected and protected everywhere. The

obligations incurred as a consequence of the perfecting of such a right and the credit thereto, according to its nature, must stand on the same footing as the right itself, and be enforced everywhere where jurisdiction for that purpose can be obtained.

It is true that when public powers and authority are executory, such powers belonging to the sovereign under whom they are exercised, cannot be put in execution by any other jurisdiction than that of such sovereign. Hence it is that the powers of an administrator, being in their nature public powers, cannot, while executing, be enforced in any other jurisdiction than his own. But when rights are matured or perfected in pursuance of such power, they should be respected everywhere. Judge Butler, in *Carmichael* v. *Ray*, 1 *Rich.* 116, fully states the principle in the following language: "If a foreign administrator has, in virtue of his administration, reduced the personal property of the deceased there situated into his possession, so that he has acquired the legal title thereto according to the laws of that country, if that property should afterward be found in another country or be carried away and converted against his will, he may maintain a suit for it there in his own name, for he is, to all intents and purposes, the owner thereof." If, then, the title acquired through his administration when perfected by reducing to possession be respected, and can be protected everywhere, surely the obligations imposed upon him as the consequence of obtaining such title, must accompany the right wherever it goes, and if the one can be vindicated the other can be enforced.

There are, indeed, many instances where, on grounds of public policy, one state will not enforce rights of a particular class matured under the laws of another state, but no means appear for drawing the case of the duty of an administrator to apply the assets received by him in the due course of administration within this class of exceptions. What ground there exists for saying that an administrator may come into the courts of the state to vindicate his title matured under the laws of another state, and yet cannot be brought before the courts of the state to answer for the proper disposition of said property under the laws by means of which it was acquired? It may and should be conceded on the principles already stated, that a foreign administrator cannot ·be

held to account for foreign assets that he has never reduced to possession, on the ground that his conduct was in violation of the laws of the state under which he derived his administration, for that would be to put in exercise those laws which can only be accomplished by the jurisdiction to which they appertain ; but where he has reduced assets to possession, and his duty springs out of and is commensurate with his title, no good reason appears why he may not be compelled to account for such assets in any state that may chance to have jurisdiction of the proper parties and the as-ets the subject of controversy.

On the other hand, to deny under such circumstances a remedy in the courts of a foreign state, might amount to the loss of all remedy whatever. When the intestate was domiciled in the state where such remedy is sought, and the assets and the person of the foreign administrator are there present, and the distributees are residents thereof, unless the remedy can be there obtained it may be impossible to obtain it anywhere.

*McNamara* v. *Dwyer*, 7 *Paige* 239, a case decided by Chancellor Walworth, fully sustains these principles, although in that case the remedy was sought at the place of an ancillary administrator, and not, as in the present case, at the domicil of the intestate. The reasoning of that case is irresistible. Unfortunately, the conclusion of that case is misstated in the head note of its report.

*Conover* v. *Chapman*, 2 *Bail.* 436. In looking into this case for another purpose, we found that it was said that the ancillary administrator could not be held accountable, except in the courts of that jurisdiction. It does not appear that any persons interested in the ancillary administration as a creditor entitled to be paid thereunder, was a party to that case. It is only one entitled to a remedy in the courts of the ancillary state against the administrator there localized who could claim such a remedy in any foreign state, by reason of the presence in such state of the parties and the subject of controversy. It follows that as no one of the parties had a right to complain of the manner in which the ancillary administration in Maryland had been conducted, that the court merely intended to say that the *proper* jurisdiction of that question was in Maryland, and not to exclude the idea that a

demand primarily cognizable in the courts of Maryland could become, under possible circumstances, cognizable in the courts of South Carolina.

*Collins* v. *Bankhead,* 1 *Strob.* 25. It is said in this case that there is a general liability on the part of the ancillary administration to account to the original administrator for the ancillary administration. This statement should doubtless be qualified in the manner already indicated, but it certainly covers the general idea that such an accountability is possible, and, such being the case, where the ancillary administrator and the domestic administrator are one person, clearly that liability could be inferred under the limitations already stated at the demand of domestic creditors or distributees in the domestic forum.

*Carmichael* v. *Ray,* 1 *Rich.* 116, while recognizing the responsibility of an ancillary administrator in respect of foreign assets reduced to possession there, properly holds that the courts of the domicil cannot aid such ancillary administrator to reduce such foreign assets to possession, even though such assets may be found at the place of domicil. This conclusion is in accordance with the principle that public powers, such as the case holds the powers of an administrator to be, cannot, while executory, be enforced by a foreign jurisdiction.

*Campbell* v. *Tousey,* 7 *Cow.* 64. A Pennsylvania executor was, in this case, held responsible to account in New York for Pennsylvania assets, received in that character. The court held that he could not be charged as executor as he had no such authority in New York, but that he was liable to account therefor as executor, *de son tort,* for such Pennsylvania assets. The difficulty in the explanation of this ground of accountability was noticed by Chancellor Walworth in McNamara *v.* Dwyer, already commented upon, but he did not undertake to develop his objection. It is obvious that to charge one as executor, *de son tort,* it must appear that he obtained assets by an act of wrong; but this cannot be affirmed of one who, by the laws of a country to which he was at the time amenable, and having jurisdiction of such assets, is clothed with authority over the same. The conclusion that such action should be maintained against the defendant as executor, *de son tort,* appears to have been forced out

of respect to the principle that a foreign executor has, as such, no standing in the domestic forum to enforce his powers as such. That is, indeed, true, but does not interfere with his accountability, based on his duty by reason of assets reduced to possession, to properly apply them in the course of administration, for the remedy in that case is upon his individual duty. When he is before the court for such a purpose, it is his powers and obligations, consummate through his authority as an executor, that is the subject of controversy.

*Boston* v. *Boylston,* 2 *Mass.* 384, was decided upon a Massachusetts statute, and is not recognized as a general authority.

*Dawes* v. *Boylston,* 9 *Mass.* 337, denies, in general terms, the right of the legatees in that case to pursue distribution in that ancillary jurisdiction, but places the conclusion on the ground that only a partial distribution could be effected in Massachusetts, and full administration only could be had at the domicil, which was England. This principle is not confined to the case of a foreign administration, but equally affects the right of seeking distribution in a case of purely domestic administration. This case cannot be regarded as going beyond the statement of an exception to the right of legatees to call the original executors to account within an ancillary jurisdiction, and is clearly no authority for the proposition that an ancillary administrator cannot be made to account for foreign assets in the jurisdiction of the domicil.

*Richards* v. *Dutch,* 8 *Mass.* 506. A Massachusetts administrator of a testator, domiciled in India, sued on a debt due to his testator in Massachusetts. The defendant attempted to show that the subject of the debt, namely, property of the testator in his possession, had been left as a legacy to him by the testator. The court treated the defence as if it had been an action by a legatee for a legacy, and, as such, denied that it could be maintained against an ancillary administrator. Nothing is said in the case about any assent of the foreign executor, and such assent does not appear to have been a matter at all considered. It may well be doubted whether the assent of the ancillary administrator could entitle the legatee to sue in a court of law. The real difficulties of the case appear not to have been developed, and it

cannot properly be regarded as an authority upon the matters under present consideration, as they were not involved in it.

*Dawes* v. *Head*, 3 *Pick.* 128. The only point actually decided was that it was not a breach of the condition of the ancillary administrator's bond ; that he had failed to pay a debt due to a foreign creditor, a resident of the country of the domicil of the foreign testator. It, therefore, can be regarded as no more than an exposition of the law of Massachusetts as it regards the extent of the objects to which ancillary administration, had in that state, primarily extends. The general discussion in that case does not profess to be material to the question then before the court ; but, even if carrying authoritative weight, the conclusion arrived at that it is the duty of the ancillary administrator, after satisfying local debts, to transmit the residuum, does not even exclude the idea that the courts of that state obtaining jurisdiction over the foreign executor, and, having the assets in their jurisdiction, might proceed to make distribution according to the law of the domicil of the testator or intestate. Much less would it exclude the idea that the courts of the domicil, having jurisdiction of the person of an ancillary administrator and control of the assets, might proceed to adjust the accountability of each ancillary administrator at least to the extent of the assets within its control.

*Fay* v. *Haven*, 3 *Metc.* 109. The defendant was both administrator of the domicil and ancillary administrator in Massachusetts, and it was held that he was not bound to account in the latter place for assets received in Louisiana, the place of domicil. This case is consistent with the proposition already stated, that when an ancillary administrator is sued in his own jurisdiction, he sufficiently accounts for foreign assets received in the character of a foreign administrator by showing that these assets are in the course of administration in the proper jurisdiction to which they appertain. It was not a case where the court was proceeding with reference to assets within its control.

*Harvey* v. *Richards*, 1 *Mason* 381, decided by Judge Story in the United States Circuit Court, must be regarded as an exposition of the laws of Massachusetts, and that case holds that where there was ancillary administration in Massachusetts of the

estate of one domiciled, at his death, in Calcutta, and leaving a will there, under which executors had qualified, such ancillary administrator could be compelled to distribute the Massachusetts assets there, when the necessary parties were all before it, and the circumstances of the case were such that complete distribution could be made. If the ancillary jurisdiction could be extended thus far, clearly a similiar exercise of authority would be competent on the part of the jurisdiction of this domicil having the legatees or distributees and the foreign ancillary administrator and the assets before it.

*Goodall* v. *Marshall,* 11 *N. H.* 85. This case did not involve the present question but gave deliberate consideration to the general question. Chief Justice Parker recognizes that special circumstances may warrant the assumption of jurisdiction by the courts of the ancillary administration in decreeing distribution, citing for that purpose Harvey *v.* Richards, and various other cases.

*Pipon* v. *Pipon, Amb.* 25, holds that distributees have no right to file a bill for a partial settlement of the estate merely, and this conclusion is placed upon the language of an English statute.

*Tourton* v. *Flower,* 3 *P. Wms.* 369, was decided upon a ground that appears to imply that a bill might properly be filed in England against an ancillary administrator there for the distribution of the estate of one domiciled in France, at his death, who left a will under which executors qualified.

It must be concluded that the proposition that an ancillary administrator, resident within the jurisdiction of the domicil of the decedent, and having there assets of the decedent, may be compelled to account there for his administration of all assets under the control of that jurisdiction, is sustained by the authorities. It follows that the administrators in the present case were bound to account for the North Carolina assets in their possession, and it remains to consider under what law the distribution of such North Carolina assets must take place.

It is well settled that the assets of a decedent, found in any state or country, whether the domicil of such decedent or otherwise, are to be applied in a course of administration, under the

laws of such state, to the extent of the payment of all debts provided for by the laws of such state, and that all preferences allowed by such laws are to be respected. It is also well settled that where a residuum remains, after satisfying the purposes of ancillary administration, it must be distributed according to the law of the domicil of the decedent. It is only necessary to make a general reference to a few of the cases. *Tucker* v. *Condy*, 10 *Rich.* 116 ; *Smith* v. *Bank*, 5 *Pet.* 518 ; *Lawrence* v. *Elmendorf*, 5 *Barb.* 73 ; *Goodall* v. *Marshall*, 11 *N. H.* 85.

The assets brought into this state by the administrators must be accounted for and distributed in this action as it regards North Carolina debts, according to the laws of the State of North Carolina.

The exceptions to the decree, so far they relate to the rule of administration, must be overruled.

The appellant excepted to the decree on the ground that a credit to the amount of $325 was not allowed. No evidence appears showing that the objects for which that amount was paid were proper for such payment. Without such proof the item could not be allowed. The exception as to the item of $1217.25 does not appear in the exceptions to the report of the referee, and cannot, therefore, be noticed ; and in addition to this there is no evidence that the amount thus paid was applied to proper objects.

The decree must be affirmed and the appeal dismissed.

McIVER, A. J., concurred.